190 P.3d 852 (2008)
Karen HALL, individually, as representative of the Estate of Dennis Hall, deceased, and as next friend of Dennis Michael Hall and Kevin Jeffrey Hall, Children, Plaintiff-Appellant,
v.
Stephen K. FRANKEL, M.D., Defendant-Appellee.
Karen Hall, individually, as representative of the Estate of Dennis Hall, deceased, and as next friend of Dennis Michael Hall and Kevin Jeffrey Hall, Children, Plaintiff-Appellee and Cross-Appellant,
v.
Walter G. Robinson, M.D. and Woodridge Orthopedic and Spine Center, P.C., Defendants-Appellants and Cross-Appellees.
Nos. 05CA2696, 06CA0946, 06CA1774, 06CA0585.
Colorado Court of Appeals.
June 26, 2008.
*856 Leventhal, Brown & Puga, P.C., Jim Leventhal, Benjamin Sachs, Hollynd Hoskins, Denver, Colorado, for Plaintiff-Appellant.
Pryor Johnson Carney Karr Nixon, P.C., Elizabeth C. Moran, Greenwood Village, Colorado, for Defendant-Appellee Stephen K. Frankel.
Johnson, McConaty & Sargent, P.C., Brian G. McConaty, Thomas J. Kresl, Brad G. Robinson, Glendale, Colorado; Jaudon & Avery, LLP, David H. Yun, Denver, Colorado, for Defendants-Appellants and Cross-Appellees.
Opinion by Judge ROY.
In this consolidated appeal of a medical malpractice action, Walter G. Robinson, M.D. (the surgeon), appeals the judgment entered on a jury verdict finding him and his professional corporation, Woodridge Orthopedic and Spine Center, P.C. (the P.C.), negligent in the death of Dennis Hall (the decedent). *857 The surgeon also appeals the trial court's calculation of prejudgment interest.
Karen Hall, wife of the decedent, for herself, the decedent's estate, and her two sons (collectively, the family), cross-appeals the trial court's denial of the family's costs with respect to the surgeon and the P.C., the dismissal of their informed consent claim against Stephen K. Frankel, M.D. (the pulmonologist), and the award of costs to the pulmonologist. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.
On June 4, 2002, the surgeon performed a total left knee replacement on the decedent. On June 12, 2002, the decedent died from blood clots in his heart and lungs.
The surgeon saw the decedent on June 5 and 6, 2002, but thereafter was "covered" as to the decedent's post-surgical hospital care by Dr. Fujisaki, an orthopedic surgeon (the colleague), and a physician's assistant (the P.A.), both of whom were employed by the P.C.
On June 7, 2002, while hospitalized, the decedent exhibited signs of hypoxia, an inadequate oxygenation of the blood. Hypoxia may be, but is not necessarily, a sign of (1) a pulmonary embolisma blood clot in the lungs, or deep vein thrombosis (DVT)a blood clot in the legs, which can lead to a pulmonary embolism, a heart attack, or a stroke; or (2) atelectasis, an incomplete expansion of a lung or portion thereof due to a collapse of the alveoli, which is associated with a lack of activity common to post-surgical patients and is not nearly as dangerous as a pulmonary embolism or DVT.
The pulmonologist consulted and examined the decedent on June 8 and 9, 2002, and ordered supplemental oxygen and a series of tests designed to rule out the possibility of a pulmonary embolism. Based on a chest x-ray, CT angiogram, the administration of blood thinners, and the fact that the decedent seemed to improve after becoming more active, the pulmonologist concluded the decedent's lowered blood oxygen was caused by atelectasis.
On June 9, 2002, the decedent was also examined by an anesthesiologist, the colleague, and the pulmonologist, all of whom concluded he suffered from atelectasis. Because the physicians believed that the decedent suffered from atelectasis, the surgeon was not notified.
An ultrasound is a common tool for diagnosing a DVT. However, an ultrasound was not ordered because the treating physicians believed it was not indicated due to the administration of an anticoagulant. A DVT is also painful, and the decedent, though medicated with pain killers, complained of pain, which the physicians took to be normal post-operative pain.
The colleague discharged the decedent from the hospital on June 9, 2002. While the decedent seemed fine on the evening of June 11, 2002, a friend discovered he had passed away on the morning of June 12, 2002. An autopsy revealed massive clotting throughout the major blood vessels of the decedent's body. However, the pathologist did not examine the veins in the decedent's left calf and thus could not confirm the presence or age of any blood clots in that location, which would have been conclusive evidence of a DVT.
The family initiated a wrongful death action against the surgeon, the P.C., and the pulmonologist (collectively, the defendants) for their failure to diagnose and treat the decedent's DVT.
The jury returned a verdict for the family and against the surgeon, finding the surgeon individually negligent and also responsible for the negligence of the colleague who was his agent. The jury also found the P.C. vicariously liable for the negligence of the surgeon and the colleague. The jury concluded that the pulmonologist was not negligent. All parties moved for the award of costs. The trial court denied the family's motion for costs against the surgeon and the P.C., and granted the pulmonologist's motion for costs against the family.
The surgeon appeals the jury verdicts against him and the trial court's calculation of prejudgment interest (Case No. 06CA0585). The family appeals the dismissal of a claim against the pulmonologist (Case No. 05CA2696) and the trial court's award of *858 costs (Case Nos. 06CA0946 and 06CA1774). The appeals have been consolidated herein.

I.
The surgeon contends that the trial court erred in allowing the family's expert witnesses to testify as to an inappropriate standard of care. We disagree.
The defendants included two orthopedic surgeons and a physician's assistant all employed by the P.C., and a pulmonologist. The standard of care witnesses included several orthopedic surgeons, two hematologists, a pulmonologist, and three forensic pathologists.
Prior to trial, the pulmonologist moved to preclude standard of care testimony from the family's expert witnesses who were not pulmonologists. The surgeon made similar and continuing objections during trial as to experts who were not orthopedic surgeons.
The trial court, reasoning that the identification and treatment of blood clots after surgery were common to many branches of medicine, including hematology, pulmonology, and orthopedics, allowed expert witnesses for both parties to testify as to the standard of care to which any medical doctor would be held, regardless of whether the witness was a specialist and regardless of his or her area of specialty, if any. The trial court stated:
[M]y understanding is that when we look at these specialties, it's like the branching of a tree. There are certain things that they all have in common. There are certain basic medical notions that people know regardless of where they branched to. And if this is something that they all know, I'm probably going to let people who are in other specialties testify as long as the nature of their testimony is you need to know that because you're a doctor.
However, the trial court precluded experts in one specialty from testifying as to the standard of care applicable to treatment rendered within, or limited to, another specialty.
The surgeon argues that the trial court erred in allowing expert physicians with specialties in areas other than orthopedic surgery to testify as to the general standard of care applicable to all physicians with respect to the diagnosis and treatment of DVT and pulmonary embolisms. He argues further that the trial court erred when it instructed the jury with both specialist and non-specialist standards of care.
We review a trial court's ruling regarding the admissibility of evidence under an abuse of discretion standard. Wallbank v. Rothenberg, 74 P.3d 413, 415 (Colo.App. 2003). A trial court's ruling will not be overturned unless it is manifestly arbitrary, unreasonable, or unfair. Id. at 415-16; People v. Moya, 899 P.2d 212, 217 (Colo.App.1994).
Physicians who practice a medical specialty are required to possess a higher degree of skill within that specialty than would a general practitioner or a practitioner in another specialty. See 1 Steven E. Pegalis & Harvey S. Wachsman, M.D., American Law of Medical Malpractice 2d § 3:3 (1992). Specialist physicians are held to a higher standard of care when practicing within their specialty. Jordan v. Bogner, 844 P.2d 664, 666 (Colo.1993). They are measured by a national standard and by what a reasonable physician certified in that specialty would do under similar circumstances. Id.; Wallbank, 74 P.3d at 416; see CJI-Civ. 4th 15:3 (2001).
Expert witnesses must then be qualified in the specialty at issue to testify as to the higher standard of care for that specialty. See Melville v. Southward, 791 P.2d 383, 388 (Colo.1990). A trial court shall not permit an expert in one medical specialty to testify against a physician in another specialty unless the expert demonstrates a substantial familiarity with the other specialty and a similarity between the standards of care in the two fields. § 13-64-401, C.R.S.2007; Melville, 791 P.2d at 388-89.
Nonetheless, as to non-specialty diagnosis and treatment, a physician in one area of practice, or a general practitioner, may testify as to the standard of care common to the medical profession. Pegalis & Wachsman, §§ 3:4, 14:3. In addition, a specialist in one field may testify as to whether a specialist in another field has met the appropriate standard of care when either of the following two criteria is met. Melville, 791 *859 P.2d at 388. One, the expert has demonstrated, through skill, knowledge, training, or experience, a substantial familiarity with the defendant's specialty such that his or her opinion is as well informed as any other expert in the defendant's specialty. Id. Or two, the expert has demonstrated that the standard of care for both specialties is substantially similar. Id.
Here, the trial court allowed expert physicians, for both the family and defendants, to testify as to the general standard of care common to the medical profession, which is applicable to any physician or fourth-year medical student. The record demonstrates that those experts established that the standard of care for diagnosing and treating blood clots was identical regardless of specialty and was a standard of care common to all physicians and fourth-year medical students. In fact, counsel for the surgeon stated that he did not object to those experts giving that type of testimony, and a defense expert in hematology gave similar testimony. Ultimately, the trial court's standard of care instruction tracked the instruction applicable to a specialist. See CJI-Civ. 4th 15:3.
The surgeon's reliance on Jordan v. Bogner is misplaced. In Jordan, a medical malpractice action against a board-certified family practice specialist, the trial court provided both specialist and non-specialist standard of care instructions. Jordan, 844 P.2d at 665-66. The jury found the specialist not negligent, and our supreme court reversed because the trial court had given the jury both specialist and non-specialist standard of care instructions without informing the jury which instructions it should apply and how to apply them. Thus, our supreme court could not discern whether the jury relied upon the erroneous non-specialist standard of care instructions or upon the specialist instructions. Id. at 666-68.
Here, however, the trial court instructed the jury as to the applicable specialist standard of care, and, unlike the situation in Jordan, the jury plainly relied upon the appropriate instruction. Any error in applying the lower non-specialist standard of care could not have prejudiced the surgeon because, if indeed the jury held him to the lower standard, it was less stringent than the specialist standard of care.
Therefore, we perceive no abuse of discretion in the trial court's admission of expert testimony with respect to the standard of care applicable to all physicians in this case against specialists.

II.
The surgeon next contends that the trial court erred in instructing the jury on agency as to the relationship between him and the colleague in the treatment of the decedent. His argument is that there can be no agency or vicarious liability between an attending and "cover physician" as a matter of law. We disagree.
In its amended complaint, the family named the surgeon, the pulmonologist, and the P.C. individually. The family alleged that the surgeon was the decedent's attending physician and as such was ultimately responsible for his care and treatment. In addition, the family alleged that the colleague was negligent and was acting as the agent of the surgeon. The family also claimed that the P.C. was vicariously liable for the negligence of its employees, including the surgeon, the colleague, and the P.A., a proposition the surgeon does not dispute here.
The trial court instructed the jury to determine whether each professional was individually and independently negligent and whether that negligence was a cause of the family's damages. The trial court also instructed the jury to determine, if it found the colleague negligent, whether the colleague was acting as an agent of the surgeon. Further, the trial court instructed the jury as to the definition of agency and the requirement that the surgeon have the right to supervise or control the manner in which the colleague treated the decedent. See Moses v. Diocese of Colorado, 863 P.2d 310, 324 (Colo.1993); Gorsich v. Double B Trading Co., 893 P.2d 1357, 1361 (Colo.App.1994).
The jury returned verdicts finding the surgeon and the colleague negligent and their negligence a cause of the family's damages. The jury also found the colleague to be an agent of the surgeon and the surgeon to be *860 vicariously liable for the colleague's negligence.
At the outset, we note that the surgeon does not argue that the evidence was insufficient to establish an agency relationship between himself and the colleague, therefore we express no opinion regarding whether the family presented evidence sufficient to justify the giving of an agency instruction to the jury. Accordingly, our inquiry is limited to whether one physician can be vicariously liable for the professional negligence of a "cover" physician as a matter of law.
As discussed subsequently, the relationship between an attending physician and a "cover" physician is not, in and of itself, sufficient to establish an agency relationship from which vicarious liability can flow. See Freyer v. Albin, 5 P.3d 329, 331-32 (Colo. App.1999). Although the appellate courts in Colorado have not held definitively that one physician may be held vicariously liable for the negligence of another physician who is acting as his or her agent, they have consistently recognized the validity of this principle between physicians and non-physicians. In Bernardi v. Community Hospital Ass'n, our supreme court held that a doctor who left instructions for tetracycline injections could not be held vicariously liable for the conduct of the nurse who negligently administered them because the physician did not have the right to supervise and control a nurse who was employed by the hospital. 166 Colo. 280, 292-95, 443 P.2d 708, 714-15 (1968). In contrast, in Beadles v. Metayka, our supreme court held that a surgeon could be held vicariously liable for the negligent acts of a nurse and an orderly employed by the hospital who were under his supervision and control in the operating room. 135 Colo. 366, 368-72, 311 P.2d 711, 712-14 (1957) (the "captain of the ship" doctrine); see also Spoor v. Serota, 852 P.2d 1292, 1296 (Colo.App.1992) (surgeon in charge may be liable for the negligence of other physicians by virtue of selection and supervision).
In Young v. Carpenter, a division of this court cited Bernardi and Beadles with approval in holding that a vicarious liability instruction should have been given where a supervising physician was present while an obstetric resident struggled to deliver an infant who suffered a permanent injury as a result of the birth. 694 P.2d 861, 863-64 (Colo.App.1984). Although it was specifically addressing a collateral estoppel argument, that division stated that "the imposition of vicarious liability is not barred as a matter of law" and then analyzed whether sufficient facts were presented to justify the instruction. Id. at 863; see also Scholz v. Metro. Pathologists, P.C., 851 P.2d 901, 905 n. 5 (Colo.1993) ("[i]t is clear, however, that the failure to detect the simple negligence of one person may, under certain circumstances, amount to medical malpractice on the part of a licensed professional who has the right to control the conduct of that person"). The Young division also held that the crucial question is not the context of the negligence but the master-servant relationship of the parties. Young, 694 P.2d at 864; see also Freyer, 5 P.3d at 331-32. The "question is not a matter of law; rather, it is a question of fact for the jury to determine." Young, 694 P.2d at 863.
Cases from other states, which apparently recognize vicarious liability between an attending physician and a covering physician, require sufficient evidence of agency or the right of supervisory control. See Reed v. Gershweir, 160 Ariz. 203, 772 P.2d 26, 27 (Ct.App.1989) (fact that physician uses a cover physician does not alone establish an agency relationship sufficient for vicarious liability); McKay v. Cole, 625 So.2d 105, 106 (Fla.Dist.Ct.App.1993) (attending physician not vicariously liable for cover physician who, with advance knowledge and consent of the patient, treats in absence of attending physician); Rossi v. Oxley, 269 Ga. 82, 495 S.E.2d 39, 40 (1998) (on-call arrangements without more do not create joint venture between attending and cover physician as a matter of public policy); Williams v. Howe, 297 A.D.2d 671, 747 N.Y.S.2d 251, 252 (2002) (vicarious liability of one physician for the professional negligence of another turns on agency or control); Rouse v. Pitt County Mem'l Hosp., Inc., 343 N.C. 186, 470 S.E.2d 44, 47-48 (1996) (genuine issue of fact as to whether attending physician could be vicariously liable for negligence of cover physician in supervising *861 hospital residents); Traster v. Steinreich, 37 Ohio App.3d 99, 523 N.E.2d 861, 863 (1987) (whether surgeon had liability for negligent acts of hospital resident in post-operative care was question for jury); Strain v. Ferroni, 405 Pa.Super. 349, 592 A.2d 698, 704-05 (1991) (no evidence attending physician exercised actual control over cover physician); McCay v. Mitchell, 62 Tenn.App. 424, 463 S.W.2d 710, 714-15 (1970) (other than in a partnership situation, attending physician not liable for professional negligence of cover physician absent agency or negligent selection).
Treatises summarize the general rule by stating that an attending physician is not vicariously liable for the negligence of a covering physician unless the plaintiff can show a relationship between the two physicians such that the attending physician has a right to control the medical performance of the covering physician. See Steven E. Pegalis, Physician and Surgeon Liability, American Law of Medical Malpractice 3d § 3:17 (2005) ("Examples of vicarious liability have been found in various cases."); Marcia Mobilia Boumil et al., Medical Liability in a Nutshell 189-94 (2d ed.2003) ("no liability will result unless there is control over such other physician"); Daniel F. Sullivan & David R. Gee, Annotation, Vicarious Liability of Physician for Negligence of Another, 38 Am. Jur. Proof of Facts 2d 445, §§ 2, 5 (1984) ("It seems to be generally agreed that vicarious liability cannot be imposed unless the substitute acted as the absent physician's agent in treating the patient."); W.R. Habeeb, Annotation, Liability of One Physician or Surgeon for Malpractice of Another: Physician's Liability For SubstituteLimitations of Rule, 85 A.L.R.2d 889, § 7[b] (1962) (a physician who sends a substitute may be liable if the substitute acts as his or her agent).
The surgeon's reliance on cases involving hospitals, health centers, and health maintenance organizations (HMOs) is misplaced. These entities may not be held vicariously liable for the negligence of their employed or contracted physicians because, as a matter of law, they are unable to control the medical practice of those physicians. This limitation on corporate employers is referred to as the prohibition of the corporate practice of medicine. §§ 12-36-117(1)(m), 25-3-103.7, C.R.S. 2007; see Moon v. Mercy Hosp., 150 Colo. 430, 373 P.2d 944 (1962) (hospital not liable for physician employee); Daly v. Aspen Ctr. for Women's Health, Inc., 134 P.3d 450, 452 (Colo.App.2005) (health center not liable because it cannot control physician's medical judgment); Freedman v. Kaiser Found. Health Plan, 849 P.2d 811, 816 (Colo.App. 1992) (HMO not responsible under respondeat superior for contracted physicians).
The public policy considerations underlying the prohibition of the corporate practice of medicine are "(1) lay control over professional judgment; (2) commercial exploitation of the medical practice; and (3) division of the physician's loyalty between patient and employer." Jeffery F. Chase-Lubitz, The Corporate Practice of Medicine Doctrine: An Anachronism in the Modern Health Care Industry, 40 Vand. L.Rev. 445, 467 (1987). Colorado permits the "corporate practice of medicine" through professional corporations, limited liability companies, and limited liability partnerships subject to structural and insurance requirements, including that all shareholders and officers be licensed to practice medicine. § 12-36-134, C.R.S.2007. Indeed, as previously indicated, the surgeon concedes that the P.C. is vicariously liable for the negligence of the colleague. The surgeon has not cited to us any authority, and we have not found any, holding that a licensed physician may not supervise and direct another licensed physician in the care of a patient as a matter of law.
Therefore, we reject the physician's argument that one physician may not be vicariously liable for the professional negligence of another physician as a matter of law.

III.
The surgeon next contends that the trial court erred when it denied his motions for directed verdict and judgment notwithstanding the verdict (JNOV). The argument challenges the sufficiency of the evidence of the surgeon's own professional negligence, to be distinguished from his vicarious liability *862 for the professional negligence of the colleague. We are not persuaded.
At the close of all the evidence, the surgeon moved for a directed verdict on the ground that there was insufficient evidence to find him negligent because he was not involved in the decedent's care at the time of the allegedly negligent acts or omissions. Following the verdict, the surgeon moved for a JNOV on the same ground. The trial court denied both motions.
The surgeon argues that the expert witnesses were not critical of the decedent's care until midnight on June 6, at which time he was no longer personally involved. In addition, he argues that he was not informed of the decedent's hypoxia, and therefore, should not be held responsible for any omissions regarding the decedent's care during his weekend off.
In reviewing a trial court's rulings on motions for directed verdicts or JNOV, we must determine whether there is any evidence of sufficient probative force to support the trial court's findings. Evans v. Webster, 832 P.2d 951, 954 (Colo.App.1991). We consider all the evidence in the light most favorable to the nonmoving party and indulge every reasonable inference that can be drawn from the evidence in that party's favor. Id.; Novell v. Am. Guar. & Liab. Ins. Co., 15 P.3d 775, 779 (Colo.App.1999).
The same standard governs a trial court's ruling on motions for directed verdict and JNOV. Archer v. Farmer Bros. Co., 70 P.3d 495, 499 (Colo.App.2002), aff'd, 90 P.3d 228 (Colo.2004). Directed verdicts require the conclusion that no reasonable person would conclude that any evidence, or any reasonable inference arising therefrom, has been presented on which the jury's verdict against the moving party could be sustained. Id. Likewise, a JNOV motion should be granted only if the evidence, viewed in the light most favorable to the non-moving party, is such that no reasonable person could reach the same conclusion as the jury. Id.
Although it was disputed, there was evidence that the surgeon was contacted regarding the decedent from June 7 through June 10, 2002. During that period, the decedent exhibited signs and symptoms which could be attributed to a pulmonary embolism or DVT. Because the surgeon assumed that other caregivers would inform him of anything of concern regarding the decedent, he never inquired into the decedent's general status.
In the evening of June 7, 2002, a nurse called the surgeon with a concern about the decedent's surgical scar. Although the decedent had exhibited signs of hypoxia beginning at midnight on June 6, 2002, the nurse did not inform the surgeon of this condition, nor did the surgeon inquire as to the decedent's general status. Instead, the surgeon ordered a course of antibiotics and a consultation by an infectious disease specialist. The infectious disease specialist then ordered a pulmonary consultation for the decedent the next day. An orthopedic standard of care expert opined that the ordering of antibiotics without first examining the decedent or reviewing his chart represented substandard care. We note that there was no showing of damages related to ordering antibiotics without first examining the decedent or his chart.
Further, at trial, the surgeon testified that he had written the decedent's discharge instructions on the day of the surgery. However, on June 9, 2002, there is evidence that the decedent's discharge instructions were inadequate, and a nurse called someone to obtain a prescription for the anticoagulant that the decedent would need following discharge. Although the nurse could not remember whom she called, and the surgeon denied being called, the surgeon's name was listed on the prescription as the prescribing physician.
There is also evidence that, as the attending physician, the surgeon was primarily responsible for the decedent's care and was responsible for discharging the decedent from the hospital. Although the pulmonologist had approved discharge on the condition that the decedent's oxygen saturation on room air was above 89%, this test was never performed. Evidence was also presented that the decedent was on narcotics at the time he received his verbal discharge instructions, including instructions as to the signs of *863 a pulmonary embolism, and yet he was not given any written instructions, and no one among his family and friends was given any verbal discharge instructions. Thus, the family presented evidence that the decedent's discharge process was substandard and that the surgeon was responsible for it.
Therefore, although the evidence was disputed, it sufficiently supported the family's theory that the surgeon was medically negligent in his direct and independent care of the decedent. Accordingly, we find no error in the trial court's denial of the surgeon's motions.

IV.
The surgeon next contends that the verdicts must be reversed because they are inconsistent. We disagree.
The jury returned verdicts finding that the surgeon and his colleague were negligent while the P.A. and pulmonologist were not negligent. The surgeon contends that, in light of the evidence presented and the jury instructions given, the verdicts are logically irreconcilable. He argues that the jury should have found either all four caregivers negligent or all four not negligent because the experts faulted all the caregivers equally. In sum, the surgeon argues that there is insufficient competent evidence to support the verdict.
Appellate courts will not reverse a jury verdict for inconsistency where the jury has been properly instructed on the law and the record provides sufficient competent evidence to support the verdict. Hock v. New York Life Ins. Co., 876 P.2d 1242, 1259 (Colo.1994). We must review the jury instructions, the jury verdict forms, and the evidence to determine whether there is competent evidence from which the jury reached its verdict. Id.; Alzado v. Blinder, Robinson & Co., 752 P.2d 544, 554 (Colo.1988). If there is a view of the case that makes the jury's verdict consistent, we have a duty to reconcile the verdict in that way. Hock, 876 P.2d at 1259.
Here, the family alleged that the surgeon, the colleague, the P.A., and the pulmonologist were negligent for failing to order an ultrasound of the decedent's leg after he exhibited signs of hypoxia. The family's expert witnesses testified that all four caregivers were negligent for failing to order the ultrasound. The trial court instructed the jury to determine, for each of the four caregivers, whether that caregiver was negligent and whether that caregiver's negligence caused the family's damages.
Expert witnesses for the family testified that a blood clot in the decedent's operative calf could have been more than five days old and, thus, present while the decedent was in the hospital. The defendants presented evidence that the decedent's fatal blood clots could have formed on June 9, the day he was discharged from the hospital. Therefore, one consistent view of the jury's verdict is that it faulted the caregivers who gave substandard care on June 9 and later.
The P.A. only tended to the decedent on June 8, 2002. She prepared his discharge instructions and discussed them with the decedent, noting that discharge was dependent on clearance by the pulmonologist. The pulmonologist saw the decedent on June 8 and early on June 9, 2002, approving discharge contingent on the decedent's having an oxygen saturation level above 89% on room air alone. However, the colleague discharged the decedent without ever verifying the decedent's room air oxygen saturation; instead, he estimated the decedent's oxygen saturation based on his saturation levels while on one liter of supplemental oxygen. Also, as discussed earlier, evidence indicated that the colleague's discharge instructions were substandard. Finally, at least one expert testified that, as the attending physician, the surgeon was ultimately responsible for the decedent's care and discharge from the hospital. Evidence was presented showing that the surgeon prepared inadequate discharge instructions and was contacted about them on June 9, 2002. In addition, there was evidence that the surgeon was contacted again between June 9, 2002, and the date of the decedent's death.
Therefore, the jury's verdict is consistent with the theory that the P.A. and the pulmonologist, who both approved discharge contingent on the decedent's oxygen saturation *864 results, were not negligent because they were not involved in the final discharge; that the colleague was negligent in discharging the decedent without verifying his room air oxygen level and without providing adequate discharge instructions; and that the surgeon, who was ultimately responsible for decedent's discharge and follow-up care, and who was contacted on the discharge day and after, was negligent as well. Because this view is supported by competent evidence and justifies the jury's verdicts, we are compelled to accept it. See Hock, 876 P.2d at 1259. Therefore, we find no reversible inconsistency in the jury's verdicts.

V.
The family contends that the trial court erred in dismissing its informed consent claim against the pulmonologist. We disagree.
In its amended complaint, the family alleged that the pulmonologist failed to obtain the decedent's informed consent for the course of treatment provided. Specifically, the family alleged that the pulmonologist failed to inform the decedent of the true nature of his condition; of the risks of, and alternatives to, the suggested course of treatment; of the availability of alternative tests such as the ultrasound; and of his risks on being discharged from the hospital.
We review de novo a trial court's grant of a motion to dismiss for failure to state a claim. Parsons v. Allstate Ins. Co., 165 P.3d 809, 814 (Colo.App.2006). We uphold a trial court's dismissal for failure to state a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Rosenthal v. Dean Witter Reynolds, Inc., 908 P.2d 1095, 1099 (Colo.1995) (quoting Dunlap v. Colorado Springs Cablevision, Inc., 829 P.2d 1286, 1291 (Colo.1992)). Considering only the pleading itself, we view all claims of material fact as true and view all allegations in the light most favorable to the plaintiff. Id. The existence and scope of legal duty comprise questions of law that fall to the determination of the court. Keller v. Koca, 111 P.3d 445, 448 (Colo.2005).
A claim for medical negligence arises when a physician acts in a manner that a reasonably careful physician would not, or fails to act as a reasonably careful physician would. Gorab v. Zook, 943 P.2d 423, 427 (Colo.1997). An informed consent claim is a separate claim premised on the adequacy of the information communicated by a physician to a patient before a procedure or treatment is begun. Id. Adequate information must include the medically significant risks that are known or ought to be known by the physician with respect to the procedure or treatment. Id. at 428. If there is no dispute over the facts, the trial court, viewing the evidence in the light most favorable to the non-moving party, may rule on an informed consent claim as a matter of law. Id.
Informed consent claims typically arise out of a substantial risk associated with a competently performed procedure. See Garhart ex rel. Tinsman v. Columbia/Healthone, L.L.C., 95 P.3d 571, 587 (Colo.2004) (injury from vaginal delivery); Gorab v. Zook, 943 P.2d at 426-27 (injury from prescribed drug); Bloskas v. Murray, 646 P.2d 907, 914-15 (Colo.1982) (injury from ankle replacement); Mallett v. Pirkey, 171 Colo. 271, 466 P.2d 466, 470 (1970) (injury from tonsillectomy); Espander v. Cramer, 903 P.2d 1171, 1174 (Colo.App.1995) (injury from wrist surgery); Martin v. Bralliar, 36 Colo. App. 254, 540 P.2d 1118, 1120 (1975) (injury from finger surgery).
In contrast, claims involving a failure to properly diagnose a condition or to order the appropriate test are generally litigated under a negligence theory. See Boryla v. Pash, 960 P.2d 123, 124-25 (Colo.1998) (failure to order a mammogram); Quiroz v. Goff, 46 P.3d 486, 488 (Colo.App.2002) (misdiagnosis); Quigley v. Jobe, 851 P.2d 236, 237 (Colo.App.1992) (failure to recommend follow-up examination).
The pivotal issue is whether a physician can be held liable on an informed consent theory when the injury arises from the physician's misdiagnosis of the condition and failure to inform the patient that further diagnostic tests could be performed, which tests the physician has concluded are not *865 medically indicated. This appears to be a matter of first impression for Colorado.
Indeed, the family has cited no Colorado statutes or cases, and we have found none, that allow an informed consent claim for the failure of the treating physician to order a diagnostic test or procedure. During arguments at trial, the family discussed Martin v. Richards, 192 Wis.2d 156, 531 N.W.2d 70 (1995), which held a physician liable under an informed consent theory when he failed to inform a father of the availability of a CT scanner to diagnose his daughter's head injury. That court held that the physician had a duty to inform the patient of all available modes of treatment, including non-invasive, diagnostic treatments such as the CT scan. Id. at 80-81. However, the court was interpreting a Wisconsin statute that codified the state's informed consent doctrine as requiring that "[a]ny physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments." Id. at 75-76 (quoting Wis. Stat. § 448.30). Colorado statutes and law do not recognize such a duty.
In addressing negligence in the context of informed consent, our supreme court has stated that a physician does not have a duty to disclose the risk of negligence in the performance of a procedure. Mallett v. Pirkey, 171 Colo. at 281, 466 P.2d at 470. Similarly, we conclude that a physician does not have a duty to disclose the risk of an error in diagnosis or to disclose the availability of diagnostic and treatment procedures he or she has concluded are not medically indicated. Errors of this sort are covered adequately by claims of negligence.
Courts in other states have reached the same conclusion. See Roukounakis v. Messer, 63 Mass.App.Ct. 482, 826 N.E.2d 777, 780-82 (2005) (failure to order ultrasound based on misdiagnosis constitutes negligence, not informed consent); Pratt v. Univ. of Minn. Affiliated Hosps. & Clinics, 414 N.W.2d 399, 401-02 (Minn.1987) (no duty to inform patient that diagnosis may not be correct); Linquito v. Siegel, 370 N.J.Super. 21, 850 A.2d 537, 543 (App.Div.2004) (no duty to inform patient of a diagnostic test for a condition the physician does not believe exists; the appropriate claim is negligence); Farina v. Kraus, 333 N.J.Super. 165, 754 A.2d 1215, 1222-23 (App.Div.1999) (error in diagnosis supports a negligence theory, not informed consent); Binur v. Jacobo, 135 S.W.3d 646, 655-56 (Tex.2004) (misdiagnosis and mistreatment support negligence, not informed consent); Backlund v. Univ. of Wash., 137 Wash.2d 651, 975 P.2d 950, 956 (1999) (misdiagnosis gives rise to negligence, not informed consent claim).
Therefore, we find no error in the trial court's dismissal of the family's informed consent claim.

VI.
The surgeon and the family contend that the trial court erred in its interest calculations and award of costs. We agree, in part.
The jury awarded the family $500,000 in total damages, including $270,000 in economic and $230,000 in noneconomic damages. The trial court then awarded $166,885.50 in prejudgment interest, $90,000 covering the period from the decedent's death to the date of filing, and $76,885.50 covering the period from the date of filing to the date of judgment.
The trial court denied the family's motion for costs against the surgeon and the P.C. on the ground that, because the family did not recover amounts in excess of its pretrial offer, it did not meet the requirements of section 13-17-202, C.R.S.2007. The trial court granted the pulmonologist's motion for costs against the family pursuant to sections 13-16-105 and 13-16-122, C.R.S.2007.

A.
The surgeon contends that the trial court erred in awarding pretrial interest in excess of $20,000 on the noneconomic damages portion of the award because section 13-64-302, C.R.S.2007, limits noneconomic damages to $250,000 including prejudgment interest. The surgeon did not object to the trial court's interest calculation prior to this appeal. Normally, we do not review issues that are raised for the first time on appeal. *866 Steedle v. Sereff, 167 P.3d 135, 139 n. 7 (Colo.2007); Estate of Stevenson v. Hollywood Bar & Cafe, Inc., 832 P.2d 718, 721 n. 5 (Colo.1992). Although we may consider issues under a plain error standard when justice requires the correction of manifest error, the use of this exception must be confined to the most compelling cases, especially in civil, as opposed to criminal, litigation. Robinson v. City & County of Denver, 30 P.3d 677, 684 (Colo.App.2000). Here, the calculation of prejudgment interest on a portion of a damages award is not in our view a sufficiently compelling error. Accordingly, we decline to address this matter.

B.
The family contends that the trial court abused its discretion in refusing to award it the reasonable costs it incurred against the surgeon and the P.C. We agree.
Here, the family prevailed on all its claims against the surgeon and some of its claims against the P.C. Prior to trial, the family offered to settle its claims against the surgeon for $500,000 pursuant to section 13-17-202. The surgeon rejected the family's offer and did not submit a counteroffer. The family also offered to settle its claims against the P.C. for $800,000 pursuant to section 13-17-202. The P.C. also rejected this offer and did not submit a counteroffer. The ultimate award against both the surgeon and the P.C., prior to the assessment of interest, was $500,000.
Section 13-16-104, C.R.S.2007, and C.R.C.P. 54(d) allow a plaintiff who prevails at trial to recover costs. Bennett v. Hickman, 992 P.2d 670, 672 (Colo.App.1999). Unless otherwise precluded by statute, the award of costs to a prevailing party is mandatory. Nat'l Canada Corp. v. Dikeou, 868 P.2d 1131, 1139 (Colo.App.1993).
The trial court denied the family's costs based on its pretrial offer to settle. As pertinent to our discussion, section 13-17-202(1)(a) provides:
Notwithstanding any other statute to the contrary, in any civil action of any nature commenced or appealed in any court of record in this state:
(I) If the plaintiff serves an offer of settlement in writing at any time more than fourteen days before the commencement of the trial that is rejected by the defendant, and the plaintiff recovers a final judgment in excess of the amount offered, then the plaintiff shall be awarded actual costs accruing after the offer of settlement to be paid by the defendant.
(II) If the defendant serves an offer of settlement in writing at any time more than fourteen days before the commencement of the trial that is rejected by the plaintiff, and the plaintiff does not recover a final judgment in excess of the amount offered, then the defendant shall be awarded actual costs accruing after the offer of settlement to be paid by the plaintiff.
In our view, that statute is inapplicable because the plaintiff never rejected an offer of settlement made under the statute. What occurred is that the defendants rejected settlement offers made under the statute by the plaintiff and the plaintiff recovered less than its rejected offers.
The intent of section 13-17-202 is to encourage settlements by imposing costs upon a rejecting party in the event the final result is less favorable to that party than the offer. Bennett, 992 P.2d at 672. This provision modifies section 13-16-104, C.R.S.2007, and C.R.C.P. 54(d) to prohibit a prevailing party from recovering costs when that party rejected a settlement offer that exceeded the ultimate award. Id. at 672-73.
Section 13-17-202 clearly and simply does not address a prevailing party who received less than its rejected offer of settlement but never rejected an offer under the statute. We cannot conclude that this omission was an oversight on the part of the General Assembly, and thus we must conclude that section 13-17-202 does not address this particular situation. See Auman v. People, 109 P.3d 647, 657 (Colo.2005); Zamarripa v. Q & T Food Stores, Inc., 929 P.2d 1332, 1339 (Colo.1997). If an offeror makes an offer to settle under the statute that is rejected, and the offeror is then liable for costs because it recovers less than its offer, *867 offers will be discouraged, a result contrary to the purpose of the statute.
Thus, we conclude that the family is not barred from an award of costs under section 13-17-202 and is entitled to an award of its reasonable costs against the surgeon and the P.C. because it is a prevailing party pursuant to section 13-16-104 and C.R.C.P. 54(d). See Nat'l Canada Corp., 868 P.2d at 1139.
As to the P.C., however, the family did not prevail on all of its claims. When each of the parties prevails on some of the claims, the award of costs is committed to the discretion of the trial court. Section 13-16-109, C.R.S.2007; Parsons, 165 P.3d at 820. The trial court is obligated to evaluate the relative strengths and weaknesses of the claims, the significance of each party's successes in the overall context of the litigation, and the time devoted to each claim. Archer v. Farmer Bros. Co., 90 P.3d 228, 231 (Colo. 2004).
Because we have no record of the trial court's analysis under Archer, on remand, the trial court must apply the Archer standard in reconsidering the family's motion for costs against the P.C.

C.
The family finally contends that the trial court's award of costs to the pulmonologist was manifestly unfair because it succeeded on the majority of its claims against all defendants and yet was awarded no costs by the trial court. We disagree.
The trial court, with some adjustments, granted the pulmonologist's motion for an award of costs against the family. Although not stated in the written order, the trial court correctly found that the pulmonologist was the prevailing party with respect to the family's claims against him.
The determination of the prevailing party with respect to the family's claims against the pulmonologist was within the discretion of the trial court. See Mackall v. Jalisco Int'l, Inc., 28 P.3d 975, 976-77 (Colo.App. 2001). The pulmonologist was found not negligent and, thus, not liable to the family. Contrary to the family's argument, for which no authority is cited, the determination of the prevailing party relates to each individual party. Therefore, we find no abuse of discretion in the trial court's award of costs to the pulmonologist.
The trial court's judgment is vacated as to costs with respect to the family's claims against the surgeon and the P. C., and the case is remanded for further proceedings on these matters consistent with this opinion. Otherwise, the judgment is affirmed.
Chief Judge DAVIDSON and Judge GRAHAM concur.