COLORADO COURT OF APPEALS                                    **2016COA176**

---

Court of Appeals No. 14CA1321
City and County of Denver District Court No. 13CV31457
Honorable Karen L. Brody, Judge

---

Hawg Tools, LLC,

Plaintiff-Appellee,

v.

Newsco International Energy Services, Inc.; Newsco International Energy
Services USA, Inc.; Newsco Directional & Horizontal Services, Inc.; and Joe
Ficken,

Defendants-Appellants.

---

JUDGMENT AFFIRMED IN PART, REVERSED
IN PART, AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE BERNARD
J. Jones and Harris, JJ., concur

Announced December 1, 2016

---

Robinson Waters & O'Dorisio, P.C., Anthony L. Leffert, Laura J. Ellenberger,
Denver, Colorado, for Plaintiff-Appellee

Gordon & Rees LLP, John R. Mann, Thomas B. Quinn, Tamara A. Hoffbuhr
Seelman, Denver, Colorado, for Defendants-Appellants

¶ 1     What is a trade secret?  According to a Colorado statute, it is, as is pertinent to this case, "the whole or any portion . . . of any . . . design . . . which is secret and of value."  § 7-74-102(4), C.R.S. 2016.  We conclude in this appeal that the act of keeping a design secret does not necessarily mean that it *is* a trade secret.  Rather, the design itself must be secret; focusing on the act of protecting the design's secrecy skips the first and fundamental step in the analytical process.

¶ 2     In this appeal, defendants, Newsco International Energy Services, Inc.; Newsco International Energy Services USA, Inc.; Newsco Directional & Horizontal Services, Inc.; and Joe Ficken, appeal the trial court's judgment in favor of plaintiff, Hawg Tools, LLC, on Hawg's claims for misappropriation of a trade secret and conversion.  Mr. Ficken appeals the judgment against him on Hawg's claim for breach of contract.  We reverse the judgment as far as Hawg's claim for misappropriation of a trade secret is concerned, but we affirm the judgment on Hawg's claims for conversion and breach of contract.

## I.    Background

### A.    Mud Motors

¶ 3    We have learned from the record that drilling operations typically employ a tool called a mud motor to drill for oil.  (Drilling fluid is commonly referred to as "mud.")  During a drilling operation, a mud motor is inserted into a well hole.  When fluid is pumped through the mud motor, the motor drives a drill bit, and the drill bit drills a hole.

¶ 4    A mud motor consists of a power section and a transmission. The power section contains a stator and rotor.  (A stator is a static part; a rotor is a moving part.)  Drilling fluid is pumped through the stator to turn the rotor.

¶ 5    The transmission consists of three parts:

(1)    a mandrel, or a tubular shaft around which other parts are assembled, which is attached to the rotor to drive the drill bit;

(2)    a bearing pack that allows the mandrel to turn the drill bit without friction; and

(3)    a bit box that contains the drill bit.

¶ 6     Bearing packs come in two types: wash bearing packs and sealed bearing packs.  A wash bearing pack leaves the bearings exposed to the surrounding mud.  In a sealed bearing pack, the bearings are lubricated by an oil bath.  The oil bath is enclosed by seals to prevent mud from leaking in.  This case involves an alleged trade secret concerning the design of a sealed bearing pack.

¶ 7     The following diagram, Figure 1, shows a typical mud motor with a sealed bearing pack.



Figure 1: Schematic of a Typical Oilfield Downhole Drilling Mud Motor (*Mud Motor Seals,* Kalsi Engineering, https://perma.cc/K2JQ-M7TD)

¶ 8     As seen in Figure 1, a sealed bearing pack includes a pressure compensating piston.  As drilling fluid pressure increases during drilling, the piston slides to compress the lubricant reservoir.  Similarly, as the oil bath heats up when the drill is withdrawn, the piston slides back to expand the reservoir.  In this way, the piston maintains equal pressure between the drilling fluid and the oil bath.

¶ 9    Sealed bearing packs protect components called thrust bearings longer than wash bearing packs.  When using a wash bearing pack, thrust bearings last a few hours before they break and then have to be replaced.  But, when using a sealed bearing pack, the seals break first instead of the thrust bearings, and the seals can last days instead of hours.  So the obvious advantage of a sealed bearing pack is that the drill runs longer before it has to be stopped to perform maintenance.

¶ 10    This kind of sealed bearing pack was invented in 1971.

### B.    This Case

¶ 11    Hawg rents mud motors to oil and gas drilling companies.  Newsco uses mud motors to provide drilling services.

¶ 12    Daniel Gallagher owned Hawg.  Before he formed this company, he operated a similar business called New Venture.  In 2008, he asked a machinist to manufacture sealed bearing packs for use in New Venture's mud motors.  The machinist arranged for a designer, Joe Ficken, who is one of the defendants in this case, to design the sealed bearing packs.

¶ 13    The designer did not receive compensation for the design.  He testified that he created it as a favor to help the machinist, a friend

who was having financial difficulties. The design was "simple," and it took him only two days to do it. Neither Mr. Gallagher nor the machinist asked him to incorporate any specific features or customizations into the design.

¶ 14    The designer assigned his rights in the design to the machinist. The machinist assigned those rights to Mr. Gallagher in exchange for $350,000, some of which was allocated to manufacture a number of sealed bearing packs for Mr. Gallagher using the design. Mr. Gallagher later assigned his rights in the design to Hawg.

¶ 15    The designer continued to make changes to the design through June of 2011. During this time — in February 2011 — he accepted a job at Newsco, and he began designing a sealed bearing pack for his new employer.

¶ 16    Mr. Gallagher learned in 2013 that the designer had designed a sealed bearing pack for Newsco. After determining that the Newsco design was similar to the Hawg design, Mr. Gallagher filed this lawsuit.

## II. Analysis

### A. Hawg Did Not Establish That Defendants Misappropriated a Trade Secret

¶ 17    Defendants contend that the trial court erred when it denied their motions for directed verdict and judgment notwithstanding the verdict on Hawg's claim for misappropriation of a trade secret. We agree because, for the reasons that we discuss below, the evidence did not prove that the design of the sealed bearing pack in question was a secret.

¶ 18    We review a trial court's rulings on motions for directed verdict and for judgment notwithstanding the verdict de novo. *Vaccaro v. Am. Family Ins. Grp.*, 2012 COA 9M, ¶ 40.

¶ 19    The determination of whether a trade secret exists is a question of fact. *Colo. Supply Co. v. Stewart*, 797 P.2d 1303, 1307 (Colo. App. 1990). In reviewing a trial court's rulings when these sorts of motions concern a question of fact, "[w]e consider all the evidence in the light most favorable to the nonmoving party and indulge every reasonable inference that can be drawn from the evidence in that party's favor." *Hall v. Frankel*, 190 P.3d 852, 862 (Colo. App. 2008). A motion for directed verdict or judgment

notwithstanding the verdict should be granted only if "no reasonable person would conclude that any evidence, or any reasonable inference arising therefrom, has been presented on which the jury's verdict against the moving party could be sustained." *Id.*; *see also Boulders at Escalante LLC v. Otten Johnson Robinson Neff & Ragonetti PC*, 2015 COA 85, ¶ 19.

¶ 20    As we noted above, and as is relevant to our analysis in this case, "'[t]rade secret' means the whole or any portion . . . of any . . . design . . . which is secret and of value." § 7-74-102(4). To determine whether a trade secret exists, the fact finder considers, among other things, the extent to which the information is known outside the business. *Colo. Supply Co.*, 797 P.2d at 1306. "The subject of a trade secret must be secret, and must not be of public knowledge or of a general knowledge in the trade or business." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974); *see also In re S & D Foods, Inc.*, 144 B.R. 121, 168 (Bankr. D. Colo. 1992)(matters commonly known in a trade or business cannot be considered trade secrets).

¶ 21    Trade secrets can consist of a combination of elements that are in the public domain if the combination is unique and the

unified process, design, and operation of these elements afford the claimant a competitive advantage. *Electrology Lab., Inc. v. Kunze,* 169 F. Supp. 3d 1119, 1153 (D. Colo. 2016); *cf. Colo. Supply Co.,* 797 P.2d at 1306 (product formulas were not trade secrets because they "were not unique to plaintiff and were versions of formulas from products not created by or unique to the plaintiff").

¶ 22    In this case, the general verdict form indicates only the jury's conclusion that defendants misappropriated a trade secret. But the trial court instructed the jury on the definition of the term "trade secret" in accordance with section 7-7-102(4) and relevant case law. So the verdict demonstrates that the jury found, at least implicitly, that the sealed bearing pack design was secret.

¶ 23    However, our review of the record reveals that "no reasonable person would conclude that any evidence, or any reasonable inference arising therefrom, [was] presented on which the jury's verdict against [defendants] could be sustained." *Hall,* 190 P.3d at 862.

¶ 24    Hawg presented ample evidence to establish that its design and the Newsco design were essentially the same. But we conclude that Hawg did not present sufficient evidence to distinguish its

design from other designs that were publicly available at the same time.  In other words, the evidence in the record showed that the design of Hawg's sealed bearing pack was "of public knowledge or of a general knowledge" in the mud motor manufacturing business, *Kewanee Oil Co.*, 416 U.S. at 475, and that the design was commonly known in that business, *see In re S & D Foods, Inc.*, 144 B.R. at 168.  In light of such evidence, which we now discuss, the record does not support a finding that Hawg's design was secret.

¶ 25    First, Mr. Gallagher testified that the "special or unique" aspect of the design he commissioned was "[t]hat, if it didn't run, [the designer] would be there to fix it."  This testimony indicates that the "secret" was that the designer was familiar with the design and technically competent to repair it if it broke.  And Mr. Gallagher testified that he had not asked the designer to include any particular feature or customization in the design.

¶ 26    Second, Hawg's expert witness testified at length to show the sealed bearing packs in the Hawg design and the Newsco design were the same.  They had the same eight components:

    (1)    An outer bearing housing.

    (2)    A mandrel to mount a drill bit.

(3)   A thrust bearing assembly to support the drill bit and to allow the mandrel to rotate inside the housing. The thrust bearings were lubricated by an oil bath contained in a lubricant reservoir. The expert testified that the Hawg device used a different thrust bearing assembly than the Newsco device. In particular, one of them used more rows of roller bearing elements than the other. But, he continued, "thrust bearings are thrust bearings are thrust bearings," and using different thrust bearings did not change the design because they performed the same function.

(4)   A piston that slid along the mandrel to maintain balance between pressure outside and pressure inside the lubricant reservoir. The expert testified that the pistons in the two designs performed the same function. He stated that, although the two designs had different dimensions, different spacing between seals, and different depths of seal grooves, there was "no functional difference between the two."

(5)	A split ring assembly to clamp the thrust bearings in place.  The expert testified that the differences in the two designs were immaterial because both types of split rings perform the same function.  He stated that "[s]plit rings are split rings.  They all serve the same function."

(6)	A lower seal carrier to seal the oil bath inside the sealed bearing assembly and provide radial support for the mandrel.

(7)	A flow restrictor.  The expert testified that the two designs used different flow restrictors that were not interchangeable because they were different sizes.  But this did not change the design because both components performed the same function.

(8)	A dump plug, or opening, in the outer bearing housing. The opening served as an exit port for drilling mud flowing through the device.

¶ 27	Figure 2 compares the Hawg sealed bearing pack (Figure 2a) and the Newsco sealed bearing pack (Figure 2b).



*Figure 2a: Hawg Design*

Opening

Outer housing    Flow restrictor    Piston    Oil bath    Split ring    Thrust bearings    Lower seal carrier    Mandrel

Opening

*Figure 2b: Newsco Design*

Figure 2: Comparison of Hawg and Newsco Designs

¶ 28    In evaluating whether the two designs were the same, the expert focused on the pressure balancing piston. But he did not identify any feature of the pressure balancing piston that was unique to the Hawg and Newsco designs. Instead, he only described the basic function of a pressure balancing piston:

> They both utilize the same method of containing oil between the lower seal carrier and the sliding piston and that is the key point, for me, that when I see how that seal carrier, mandrel and piston was executed in the design, this is why I'm saying it's the same design.
>
> . . . .

12

> The criteria that I used [to determine whether the designs were the same] rests on the fact that the piston is sliding along the mandrel to create a balanced pressure between the lubricating oil and the drilling mud. I've based my decision that the designs are similar on that mechanical aspect of the design.

¶ 29    Third, the expert testified that the Hawg design was different from designs that were publicly available in 2008 for the following reasons:

- Not all sealed bearing packs had the same eight components in the same configuration. But the expert did not give any examples. And he did not testify that *only* the Hawg and Newsco designs used these eight components in this configuration.

- Although some patented sealed bearing packs had a balanced seal arrangement like the Hawg and Newsco designs, some of their design elements were different. But he did not specify which elements were different.

- The patents in his report showed designs that were different from the Hawg and Newsco designs in the following ways:

- ° There were differences in how they were organized. But he did not specify what those differences were or why they were significant.

- ° Some of the designs had extra thrust bearings. But he had testified earlier that the Hawg design and the Newsco design were the same even though they had different thrust bearings.

- ° Some designs had radial bearings. But the fact that *some* designs had a different type of bearing than the Hawg design does not establish that *all* of them were different.

- ° Some had a mandrel with a different geometry. But he did not explain how this made the design different. And again, the fact that *some* designs were different does not establish that *all* of them were different.

¶ 30   The expert also asserted that the patented designs must have been different from the Hawg design because the United States Patent and Trademark Office had issued patents on those designs. But such reasoning is not convincing because the Patent and

Trademark Office had not reviewed the Hawg design or compared it to patented designs.

¶ 31 Fourth, when asked what would be the smallest change necessary to produce a different design of a sealed bearing pack, the expert testified:

> That's a tough question. As the designs are fairly well evolved, there's not a whole lot of room in the tool to, to change the design. You're very limited. It wouldn't be unusual for different designers to come up with the same ideas, except not quite dimensionally the same. That does *not* constitute a different design. The designers may try to do things like change the . . . seals, change some dimensions, all with a view to improving sealed bearing longevity down hole. I've done similar things myself. I've tried different seals, I've tried seal vents, things of that sort, but the overall design didn't change. So, as to the smallest element that would change the design, . . . *they would have to get rid of the piston, the mandrel, and the flow restrictor and try something else to make it totally different.*

(Emphasis added.) Defense counsel asked if a sealed bearing pack without those elements would be operable. The expert responded, "[I]t's conceivable that somebody could come up with something to change those elements. And, yes, they could conceivably come up with a different sealed bearing pack design. I haven't seen it."

¶ 32     So, although the expert said that the Hawg design and the Newsco design were the same, he did not provide evidence of sufficient probative force to support a conclusion that the Hawg design of a sealed bearing pack was different from publicly available designs that existed before the designer had designed it.  To the contrary, the expert's testimony supported a conclusion that drastic changes would be required to create a different sealed bearing pack design.

¶ 33     Fifth, a defense expert compared the Hawg design to designs that had been publicly available at that time.  One of these was illustrated by U.S. Patent Application Pub. No. 2003/0015352 fig.1 (filed July 17, 2001), which we compare to the Hawg design in Figure 3.



Figure 3a: Hawg Design

Outer housing    Flow restrictor    Piston    Oil bath    Split ring    Thrust bearings    Lower seal carrier    Mandrel

Opening

*Figure 3b: U.S. Patent Pub. No. 2003/0015352*

Figure 3: Comparison of Hawg Design and Illustrative Design

¶ 34     We can see that the illustrative design includes the same eight components in substantially the same configuration as the Hawg design. Hawg did not present any evidence to show what variations, if any, between its design and the illustrative design were sufficient to establish that the designs were different according to the standard set by its own expert.

¶ 35     Sixth, the designer testified that he created the Hawg design based on an example that he had found in a handbook published by Kalsi Engineering. That design, shown earlier in this opinion as Figure 1, also appears to have the same basic components as the Hawg design.

17

¶ 36　In summary, Hawg did not establish that its design, in whole or in part, was substantially different from designs that were publicly available at the time of its creation.  We therefore conclude that the record lacks evidence of sufficient probative force to support a conclusion that the Hawg design was secret.  *See Kewanee Oil Co.*, 416 U.S. at 475; *Hall*, 190 P.3d at 862.

¶ 37　Hawg points to a lot of evidence in the record that supports its assertion that it took careful steps to keep its design a secret.  *See* § 7-74-102(4) ("To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)("Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others."); *cf. Saturn Systems, Inc. v. Militare*, 252 P.3d 516, 521-22 (Colo. App. 2011)(in a trade secret case dealing with sensitive information, as opposed to a design, extensive efforts by the holder of the information to maintain its secrecy can be a

relevant factor to determining whether the information is a trade secret).

¶ 38    But that is not the first question that we needed to answer in this appeal. We had to decide instead whether sufficient evidence showed that the design was a secret in the first place, and we have concluded that the evidence on that issue was insufficient. *See Kewanee Oil Co.,* 416 U.S. at 475; *accord* Restatement (First) of Torts § 757 cmt. b (Am. Law Inst. 1939)("The subject matter of a trade secret must be secret."). In other words, Hawg's efforts to protect the secrecy of its design did not bear on our analysis because the design was not a secret in the first place. *See Kewanee Oil Co.,* 416 U.S. at 475; *accord* Restatement (First) of Torts § 757 cmt. b ("Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.").

¶ 39    So, after reviewing all the evidence in the light most favorable to Hawg and after indulging every reasonable inference that can be drawn from that evidence in Hawg's favor, we conclude that the record does not contain sufficient evidence to support the trial court's decision to deny defendants' motions for a directed verdict and for judgment notwithstanding the verdict on Hawg's claim for

misappropriation of a trade secret. *See Hall,* 190 P.3d at 862. We therefore additionally conclude that the court should have granted those motions because no reasonable person would conclude that any evidence, or any reasonable inference arising from that evidence, had been presented that could sustain the jury's verdict. *See id.* We therefore reverse the judgment in favor of Hawg on that claim.

### B.    Defendants Waived the Defense of Preemption

¶ 40    Defendants contend that the trial court erred when it denied their motion for judgment notwithstanding the verdict on Hawg's conversion claim, which alleges that they "committed unauthorized acts of dominion, control, and ownership over the [sealed bearing pack] designs for their financial benefit." Defendants assert that the Uniform Trade Secrets Act preempts claims for conversion of trade secrets. *See* § 7-74-108, C.R.S. 2016. We disagree, although we apply different reasoning than the trial court used. *Negron v. Golder,* 111 P.3d 538, 542 (Colo. App. 2004)(court of appeals may affirm on different grounds than those relied upon by trial court).

¶ 41    Under C.R.C.P. 8(c), a defendant waives all affirmative defenses and avoidances that do not appear in his or her answer.

*Town of Carbondale v. GSS Props., LLC,* 169 P.3d 675, 681 (Colo. 2007); *Duke v. Pickett,* 168 Colo. 215, 218, 451 P.2d 288, 290 (1969). But "an opposing party who fails to object to an untimely affirmative defense and instead chooses to litigate the merits of the defense in a summary judgment proceeding cannot raise a timeliness objection *after* the trial court has ruled on the summary judgment motion." *GSS Props., LLC,* 169 P.3d at 679-80.

¶ 42 If a preemption defense concerns the choice of law to be applied by the trial court, and not whether the trial court has jurisdiction to hear the parties' dispute, the defense can be waived. "If, as in most cases, the alleged preemption would simply alter the applicable substantive law governing the case, then preemption is waivable." *Id.* at 682. Or, to put it another way, "where preemption changes only the law to be applied, rather than the forum applying it, preemption is an affirmative defense which will be waived unless timely raised." *Id.*

¶ 43 In this case, defendants did not assert that the trial court was an improper forum for their defense. Instead, they simply contended that the substance of Hawg's conversion claim was preempted by state statute. This was a preemption defense based

on choice of law.  So we conclude that, not only could this defense be waived, but defendants waived it because they raised it for the first time in their motion for judgment notwithstanding the verdict. *See* C.R.C.P. 8(c); *GSS Props., LLC*, 169 P.3d at 681; *Duke*, 168 Colo. at 218, 451 P.2d at 290; *see also Fid. Nat'l Title Co. v. First Am. Title Ins. Co.*, 2013 COA 80, ¶ 51 (raising an issue for the first time in a post-trial motion is insufficient to preserve it for appeal); *Miller v. Rowtech, LLC*, 3 P.3d 492, 495 (Colo. App. 2000)(party waives defense that it first raises in a post-trial motion); *Levy-Wegrzyn v. Ediger*, 899 P.2d 230, 232 (Colo. App. 1994).

¶ 44     We recognize that, in the response to defendants' motion for judgment notwithstanding the verdict, Hawg addressed defendants' preemption claim on the merits.  But Hawg bracketed that two-paragraph discussion with two sentences.  The first sentence stated that "[a]fter more than a year of litigation, extensive briefing on every topic imaginable, and motions for directed verdicts, [d]efendants for the first time claim that Hawg's conversion claim is preempted by the Colorado Uniform Trade Secrets Act."  The last sentence said, "[h]owever, never before this juncture did . . .

[d]efendants raise any issue regarding the preemption or displacement of the conversion claim."

¶ 45     We conclude that the first and last sentences of the discussion of the preemption claim preserved Hawg's objection to the court considering that claim at such a late date in the proceedings. *See GSS Props., LLC*, 169 P.3d at 679-80. The substantive discussion of the issue was not Hawg's only argument; it was simply an alternative argument.

### C.    Hawg Has Standing to Bring Its Claim Against the Designer for Breach of Contract

¶ 46     The designer contends that the trial court erred when it rejected his assertion that Hawg lacks standing to bring suit against him for breach of contract based on his violation of a confidentiality agreement. He asserts that he executed the agreement with Mr. Gallagher and that Mr. Gallagher did not properly assign his rights under the agreement to Hawg. We disagree.

¶ 47     Standing is a question of law that we review de novo. *Ainscough v. Owens*, 90 P.3d 851, 856 (Colo. 2004). Contract interpretation and the validity of an assignment also present questions of law that we review de novo. *Regency Realty Inv'rs, LLC*

*v. Cleary Fire Prot., Inc.*, 260 P.3d 1, 4 (Colo. App.

2009)(assignment); *Roberts v. Adams*, 47 P.3d 690, 694 (Colo. App.

2001)(contract interpretation).

¶ 48    C.R.C.P. 17(a) requires that every action "be prosecuted in the

name of the real party in interest."  A plaintiff whose standing

depends upon its status as an assignee must prove "a full and

complete assignment of the claim from an assignor who was a real

party in interest with respect to the claim."  *Alpine Assocs., Inc. v.*

*KP & R, Inc.*, 802 P.2d 1119, 1121 (Colo. App. 1990).

> [A]bsent some express reservation or limitation
> upon the interest transferred, or some other
> evidence of a contrary intent to be found
> within the transferring document, an
> assignment of all of an owner's right, title, and
> interest in intangible personal property
> includes an assignment of any agreement
> respecting that property to the extent that
> such agreement benefits the transferee
> because of his or her ownership of the
> property.

*Thistle, Inc. v. Tenneco, Inc.*, 872 P.2d 1302, 1306 (Colo. App. 1993).

¶ 49    In *Thistle*, the plaintiff acquired ownership of certain

proprietary data.  The predecessor in title to the data had entered

into agreements with the defendant that prohibited the defendant

from transferring the data or making it available to any third

person. *Id.* at 1303. The division held that "[t]he right to control the persons who have access to . . . data is necessarily an incidental attribute of the right of ownership of that data. Indeed, without the right to such control, the right of ownership would be meaningless." *Id.* at 1307.

¶ 50    In this case, the designer and the machinist entered into an Assignment Agreement with Mr. Gallagher in 2010. As is relevant to our analysis, the agreement read:

> Assignment. [The machinist] hereby transfers, assigns and conveys to Assignee, its successors and assigns, all of his right, title and interest in and to the [sealed bearing pack] [d]esigns, including prints, elaborations, explanations, illustrations and other instructional or directive material, inventions, improvements, techniques and any other materials possessed, developed, conceived or invented by [the designer] necessary to the design and operation of the [sealed bearing packs] (the "Protected Material").
>
> . . . .
>
> Confidentiality. [The designer] shall not at any time use for [his] own benefit, or disclose to any person or entity any of the Protected Materials or any information related thereto (the "Confidential Information").
>
> . . . .

> General. . . . This Agreement will inure to the benefit of, and be binding upon the parties and their respective heirs, successors and assigns.

¶ 51 Mr. Gallagher entered into an Assignment and Contribution Agreement with Hawg in 2012. That agreement assigned "all of [Mr. Gallagher's] right, title, and interest in and to the [s]eal[ed] [b]earing [p]ack [d]esign[]" to Hawg. The agreement did not specifically refer to the 2010 Assignment Agreement between Mr. Gallagher and the designer.

¶ 52 But the 2010 Assignment Agreement conveyed both the rights to the sealed bearing pack design and the right to control the designer's disclosure of the design. The confidentiality clause benefited Mr. Gallagher because of his ownership of the design. So the right to control the designer's disclosure of the design was necessarily an incidental attribute of the right of ownership. As a result, the assignment of all of Mr. Gallagher's right, title, and interest in the design included an assignment of the confidentiality agreement. *Id.* at 1306.

¶ 53 We reject the designer's contention that the confidentiality clause cannot be assigned. *Cf. People v. Adams*, 243 P.3d 256, 261 (Colo. 2010)(Colorado law "disallows assignments involving matters

of personal trust and confidence"; a claim to treble damages under the Trust Fund Statute was not assignable because it was in the nature of a penalty); *but see Matson v. White*, 122 Colo. 79, 84, 220 P.2d 864, 866 (1950)(contracts not involving personal skill, trust, or confidence are generally assignable without consent).  The confidentiality clause did not involve matters of personal trust or confidence; it merely constrained the designer's disclosure of information.  And the 2010 Assignment Agreement expressly stated that it would "inure to the benefit of . . . the parties . . . and [their] assigns."

¶ 54    We therefore conclude that Mr. Gallagher fully assigned his rights under the 2010 Assignment Agreement to Hawg.  So Hawg had standing as the real party in interest with respect to its claim for breach of that agreement.

¶ 55    The judgment is reversed as to Hawg's claim for misappropriation of a trade secret.  We remand the case to the trial court to enter judgment in favor of defendants on that claim and to vacate the award of damages on that claim.  The judgment is otherwise affirmed.

JUDGE J. JONES and JUDGE HARRIS concur.

27