**Benjamin J. POMERANTZ, M.D., on behalf of himself and all others similarly situated, Plaintiff–Appellant,**

v.

**MICROSOFT CORPORATION, a Washington corporation, Defendant–Appellee.**

No. 01CA0458.

Colorado Court of Appeals, Div. IV.

May 9, 2002.

Pendleton, Friedberg, Wilson & Hennessey, P.C., Alan C. Friedberg, Susan M. Hargleroad, Michelle Rene Kestler, Denver, Colorado, for Plaintiff–Appellant.

Davis Graham & Stubbs LLP, Gale T. Miller, Michael J. Gallagher, John Allen Francis, Denver, Colorado; Sullivan & Cromwell, David B. Tulchin, Joseph E. Neuhaus, New York, New York, for Defendant–Appellee.

Opinion by Judge TAUBMAN.

Plaintiff, Benjamin J. Pomerantz, M.D., appeals the judgment dismissing his complaint against defendant, Microsoft Corporation, for violation of the Colorado Antitrust Act of 1992, § 6–4–101, et seq., C.R.S. 2001(Act), by allegedly overcharging for its Windows 98 operating system. We affirm.

## I. Facts and Procedural History

Microsoft is a corporation, organized under the laws of the state of Washington, that primarily focuses on developing and licensing computer software. In 1985, Microsoft began marketing its Windows operating system for Intel-based personal computers. When Pomerantz and plaintiff Douglas E. Papish filed this action, Windows 98 was the most current version of the operating system then in use.

Microsoft distributed Windows 98 through original equipment manufacturers (OEMs), who preinstalled the operating system on personal computers, and through software retailers who sold CD ROMs containing the software. However, Microsoft does not sell its software to OEMs, retailers, or consumers. Rather, the company licenses the use of its software to consumers through an end user license agreement (EULA) and to OEMs and retailers through a similar licensing agreement. The EULA prohibits end users from copying, modifying, or transferring the software, and it sets out the scope of Microsoft's warranty of the product.

Sometime in 1998, Pomerantz purchased a CD ROM, for approximately $89, that contained Windows 98, and Papish purchased an Intel-based personal computer on which the OEM had preinstalled the Windows 98 operating system. As a precondition to their first use of Windows 98, Pomerantz and Papish were required to accept Microsoft's EULA.

In March 2000, Pomerantz and Papish filed their second amended complaint on behalf of a class of Colorado consumers claiming that Microsoft had monopolized the market for Intel-based operating systems and, as a result, Microsoft had overcharged them for the Windows 98 operating system.

This lawsuit is one of many similar lawsuits filed in state and federal courts alleging that Microsoft has monopolized the market for operating systems for Intel-based personal computers and that it has maintained that monopoly by anticompetitive and unreasonable exclusionary conduct. In their class action complaint, Pomerantz and Papish alleged that Microsoft, by virtue of its anticompetitive conduct, had (1) participated in and facilitated a contract, combination, or conspiracy illegally restricting trade and commerce in violation of § 6–4–104, C.R.S.2001, and (2) attempted to monopolize, combine, and conspire to monopolize and had, in fact, monopolized that market for operating systems for Intel-based personal computers in trade and commerce, in violation of § 6–4–105, C.R.S.2001. Finally, Pomerantz and Papish alleged that EULAs between Microsoft and them were void contracts pursuant to § 6–4–121, C.R.S.2001.

Pomerantz and Papish sought damages for the difference between the monopoly price of Windows 98 and the price for which Windows 98 could have been sold in a competitive market; treble damages pursuant to § 6–4–114, C.R.S.2001; a refund of all payments made upon, under, or pursuant to the purchase of Windows 98 and the EULA; expert and attorney fees; and costs. They sought relief for themselves and a class of similarly situated Colorado consumers.

Before the trial court determined whether this case should be certified as a class action, Microsoft moved to dismiss, contending that the complaint failed to state a claim under the Act. The trial court granted the motion, concluding that Pomerantz and Papish lacked standing to pursue their antitrust claims because they were indirect purchasers under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and that their other claims were without merit.

Only Pomerantz has elected to pursue this appeal.

## II. Rule of Necessity

██ Initially we note, as we disclosed to counsel at oral argument, that each judge on this court uses the Windows 98 operating system or a more current version of the software. To the extent that there may be a conflict of interest, we conclude that the rule of necessity requires us to proceed. *See Office of State Court Adm'r v. Background Info. Servs., Inc.*, 994 P.2d 420, 426 (Colo. 1999)(the rule of necessity provides that it may become necessary for the judges of a court to hear a case in which they may have an interest where no one else can take their place); Model Code of Judicial Conduct Can-

on 3(E)(1) (1990) (commentary states, "Rule of necessity may override the rule of disqualification.").

### III.   Standard of Review

In evaluating a motion to dismiss for failure to state a claim, the material allegations in the complaint are deemed admitted. A trial court should grant the motion only if it appears that the plaintiff would not be entitled to any relief under the facts pleaded. Upon review, an appellate court is in the same position as the trial court. *Davidson v. Dill*, 180 Colo. 123, 503 P.2d 157 (1972).

### IV.   Standing Under the Act

The principal issue in this case is whether the trial court correctly concluded that the indirect purchaser rule announced in *Illinois Brick Co. v. Illinois, supra*, applies to this case, and, if so, whether Pomerantz lacks standing to proceed. We agree with the trial court's resolution of this issue.

#### A.   Elements of Standing

Pomerantz asserts that the trial court erred when it dismissed his complaint because, either as an indirect purchaser or as a direct end user licensee, he has standing under § 6-4-114(1), C.R.S.2001, of the Act, to bring this suit against Microsoft. We disagree.

■ The question of standing is really an inquiry into whether the statutory provision on which the claim rests can properly be understood as granting persons in the plaintiff's position a right to judicial relief. *Stifflear v. Bristol–Myers Squibb Co.*, 931 P.2d 471, 473 (Colo.App.1996). Resolution of the standing issue involves two considerations: (1) whether the party seeking judicial relief has suffered an injury in fact, and (2) whether the injury is to a legally protected interest as contemplated by statutory or constitutional provisions. If the plaintiff has not suffered such an injury, standing does not exist, and the case must be dismissed. *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977).

The critical inquiry for our purposes is whether Pomerantz asserted injury to an interest legally protected or cognizable under the Act. *See Stifflear v. Bristol–Myers Squibb Co., supra.*

#### B.   Does *Illinois Brick* Apply in this Case?

Pomerantz contends that the trial court erred in concluding that the *Illinois Brick* indirect purchaser rule applies in this case. Specifically, he argues that because members of the putative class are licensees of Microsoft and Windows 98 was not sold to them, but rather only licensed, the lack of a sale takes this case outside of the purview of *Illinois Brick*. We are not persuaded.

*Illinois Brick* established the indirect purchaser rule. There, the state of Illinois brought suit against concrete block manufacturers, alleging price fixing in violation of § 4 of the Clayton Act, 15 U.S.C. § 15. The Supreme Court concluded that the state was an indirect purchaser because it did not buy concrete block directly from the manufacturers. Rather, the manufacturers had sold their concrete block to masonry contractors who performed masonry work on buildings that the state had purchased from general contractors. The Court held that a party who does not purchase a product directly from an alleged antitrust violator cannot sue to recover treble damages for an illegal overcharge under § 4 of the Clayton Act. *See Illinois Brick, supra*, 431 U.S. at 729, 97 S.Ct. at 2066, 52 L.Ed.2d at 715 (it is the direct overcharged purchaser, and not others in the chain of distribution, who has been injured within the meaning of the Clayton Act, regardless of any amount that purchaser may have passed on to its customers).

The Court reasoned that allowing recovery by an indirect purchaser would create a risk of double liability for antitrust violators because the direct purchaser would still be able to recover the full amount of the overcharge from the antitrust violator. *Illinois Brick, supra*, 431 U.S. at 730–31, 97 S.Ct. at 2067, 52 L.Ed.2d at 715–16. Additionally, the Court expressed concern about the difficulty of tracing overcharges passed on to remote end purchasers and the complexity of massive multiparty lawsuits, with burdensome and complex issues of proof involving many levels of distribution, including large classes

of consumers remote from the antitrust violator. *Illinois Brick, supra,* 431 U.S. at 740, 97 S.Ct. at 2071–72, 52 L.Ed.2d at 721. In so ruling, the Court extended the precedent established in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), which prohibited defensive use of the pass-on theory, and concluded that one rule applies equally to defendants and plaintiffs.

In *Stifflear,* a division of this court applied *Illinois Brick* and held that indirect purchasers do not have standing under the 1957 Colorado Antitrust Act to bring claims for money damages or injunctive relief based on alleged overcharges by manufacturers or wholesalers in violation of Colorado's antitrust statute. *Stifflear, supra,* 931 P.2d at 476. *See* § 6–4–114(1), (affording private right of action to "any person" injured by "any violation" of the Act); *see also* § 6–4–119, C.R.S.2001 (expressing intent of General Assembly that, in construing the Act, courts should use as a guide interpretation by federal courts of comparable federal antitrust laws). Although *Stifflear* addressed the 1957 Act, Pomerantz concedes, and we agree, that there is no basis for applying a different analysis to claims brought under the current Act.

Although the Supreme Court in *Illinois Brick* expressly stated that it was not deciding the issue of standing, virtually all other courts addressing the issue have applied *Illinois Brick* to preclude standing by indirect purchasers. *See, e.g., In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599 (7th Cir.1997); *Chatham Brass Co. v. Honeywell, Inc.,* 512 F.Supp. 108 (S.D.N.Y. 1981); *Dart Drug Corp. v. Corning Glass Works,* 480 F.Supp. 1091 (D.Md.1979); *Berghausen v. Microsoft Corp.,* 765 N.E.2d 592 (Ind.Ct.App. 2002); *Duvall v. Silvers,* 998 S.W.2d 821 (Mo.Ct.App.1999). *See also Illinois Brick, supra,* 431 U.S. at 728 n. 7, 97 S.Ct. at 2065, 52 L.Ed.2d at 711 (noting the question of "which persons have been injured by an illegal overcharge for purposes of [the Clayton Act] is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to

sue for damages under [that Act]"); *Stifflear, supra,* 931 P.2d at 476.

Here, it is undisputed that Microsoft does not sell its Windows 98 operating system. Instead, it parcels out different rights with respect to its software, and these rights are bundled together as a license to use the product that it distributes to consumers through OEMs and retailers. *See In re Microsoft Corp. Antitrust Litig.,* 127 F.Supp.2d 702 (D.Md.2001) (consolidation of sixty-four similar antitrust actions). The licensing agreement, or EULA, stems from federal copyright laws. In return for a single fixed payment, the consumer may use the operating system in perpetuity. As a result, although the operating system itself is not sold, the licensing agreement is the functional equivalent of a sale.

■ Moreover, the rationale underlying *Illinois Brick* does not support affording standing to a licensee. The overcharge allegedly paid by Pomerantz as a licensee is no less difficult to ascertain than that suffered by an indirect purchaser who actually purchased a product or commodity. This is so because the same policy concerns noted in *Illinois Brick*—a risk of double liability for antitrust violators, tracing the amount of overcharges passed on to remote end users, massive multiparty lawsuits, and overlapping recoveries by consumers, OEMs, and retailers-would be present in any action by a licensee who indirectly acquires licensed software. *See Berghausen v. Microsoft Corp., supra* (noting *Illinois Brick* policy considerations in Microsoft antitrust litigation); *see also Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199, 216, 110 S.Ct. 2807, 2817, 111 L.Ed.2d 169, 186 (1990)(broadly upholding the direct purchaser rule announced in *Hanover Shoe* and *Illinois Brick* and declining to carve out exceptions for particular types of markets or based on assumptions underlying a particular economic transaction).

Thus, we conclude that *Illinois Brick* applies to licensees as well as to indirect purchasers.

We recognize that some states expressly allow indirect purchasers to bring an action for damages under their antitrust laws. *See, e.g.,* Ala.Code § 6–5–60(a) (2001); Cal. Bus.

& Prof.Code § 16750(a) (2001); Wis. Stat. § 133.18(1)(a) (2001). A number of states have adopted statutes, similar to the Act, that allow "any person" who has been injured to bring an action for antitrust violations. *See, e.g.,* N.C. Gen.Stat. § 75–16 (2001); Tenn.Code Ann. § 47–25–106 (2001). While these statutes do not expressly allow indirect purchasers to bring an action for damages, some appellate courts have concluded that *Illinois Brick* does not apply under such statutes and have permitted actions by indirect purchasers. *See, e.g., Hyde v. Abbott Labs., Inc.,* 123 N.C.App. 572, 473 S.E.2d 680 (1996).

■ However, we conclude that in Colorado, the phrase "any person" under § 6–4–114(1) means anyone who independently has standing under the Act. *See, e.g., Hall v. Walter,* 969 P.2d 224 (Colo.1998)(interpreting the term "any person" under Colorado Consumer Protection Act (CCPA), the court concluded that third-party nonconsumers have standing to bring actions under the CCPA, provided they satisfy the two-part standing test under *Wimberly v. Ettenberg, supra* ). Accordingly, because we have held that Pomerantz lacks standing under *Illinois Brick,* the "any person" language of § 6–4–114(1) is of no avail.

Relying on *Campos v. Ticketmaster Corp.,* 140 F.3d 1166 (8th Cir.1998), Pomerantz contends that, notwithstanding his direct payment to a retailer for Windows 98, he is not an indirect purchaser. He argues that billing practices are not determinative of indirect purchaser status. We are not persuaded.

In *Campos,* Ticketmaster was the alleged monopolist of ticket distribution services. It collected money for ticket sales directly from consumers. The plaintiffs, who were consumers, sued Ticketmaster, alleging that they were direct purchasers of Ticketmaster's ticket distribution services. The Eighth Circuit disagreed, concluding that the plaintiffs were indirect purchasers. It reasoned they could buy Ticketmaster's services only because the individual concert venues had been required to buy those services first. In so concluding, the court noted that an "indirect purchaser is one who bears some portion of a monopoly overcharge only by virtue of an antecedent transaction between the monopolist and another, independent purchaser." *Campos v. Ticketmaster Corp., supra,* 140 F.3d at 1169 (summarizing numerous definitions of term "indirect purchaser").

■ Here, as in *Campos,* Pomerantz was an indirect purchaser by virtue of an antecedent transaction—the license agreement between Microsoft and the OEMs and retailers. Thus, *Campos* does not support Pomerantz's contention.

### C. Is Pomerantz a Direct Purchaser?

Nevertheless, Pomerantz argues that even if the trial court correctly concluded that his acquisition of a license to use Windows 98 was the functional equivalent of a sale, the trial court erred in not concluding that such sale was between him and Microsoft, thereby making him a direct purchaser under *Illinois Brick.* Again, we are not persuaded.

Pomerantz urges us to distinguish between the purchase of tangible property, such as concrete blocks, personal computers, or CD ROMs, and the licensing of intangible software. He argues that a licensing agreement, or the EULA in this case, creates a functional economic unity between Microsoft, on the one hand, and OEMs and retailers, who distribute the operating system, on the other. He contends that effectively only one transaction exists between Microsoft and end user licensees of Windows 98, who are themselves in direct privity with Microsoft. In other words, Pomerantz argues that he is a direct purchaser because a direct contractual relationship exists between him and Microsoft as a result of the EULA that he was required to accept when he first used the Windows 98 operating system.

■ However, we disagree and instead conclude, as has virtually every other court addressing this issue, that the relationship established through the EULA between Microsoft and the end user is insufficient to make the end user a direct purchaser under *Illinois Brick.* Significantly, in the consolidated federal action, the district court held that whether the consumer purchases the software or just the license to use it, the

immediate economic transaction constituting the purchase occurs between the consumer and the OEM or the retailer. *See In re Microsoft Corp. Antitrust Litig., supra,* 127 F.Supp.2d at 709. Other appellate courts that have considered this issue under state antitrust laws similar to the Clayton Act have reached the same conclusion. *See Vacco v. Microsoft Corp.,* 260 Conn. 59, 793 A.2d 1048 (2002); *Berghausen v. Microsoft Corp., supra; Davidson v. Microsoft Corp.,* 143 Md. App. 43, 792 A.2d 336 (Ct.Spec.App.2002); *Minuteman, LLC v. Microsoft Corp.,* 795 A.2d 833 (N.H.2002). The EULA, and whatever contractual relationship it establishes, has no bearing on whether the consumer is a direct purchaser under *Illinois Brick.*

Thus, we conclude that Pomerantz is not a direct purchaser of Windows 98.

### D. Exceptions to *Illinois Brick*

Pomerantz next contends that, even if *Illinois Brick* applies here, the trial court erred in concluding that he did not fall within its exceptions. We disagree.

There are two recognized exceptions to the *Illinois Brick* direct purchaser rule: the control exception and the preexisting cost-plus contract exception.

#### 1. Control Exception

Pomerantz contends that the trial court erred in determining that the control exception to *Illinois Brick* did not apply in this case. Again, we disagree.

The Court in *Illinois Brick* noted, in a footnote, that in some situations an indirect purchaser might be permitted to maintain an antitrust action where the direct purchaser (in this case the OEMs and retailers) is owned or controlled by its customer. *Illinois Brick, supra,* 431 U.S. at 736 n. 16, 97 S.Ct. at 2070 n. 16, 52 L.Ed.2d at 719 n. 16. Courts have narrowly construed this exception and limited it to relationships involving such functional or other economic unity that there has effectively been only one sale. *Jewish Hosp. Ass'n v. Stewart Mech. Enters., Inc.,* 628 F.2d 971 (6th Cir.1980). Indeed, the Seventh Circuit permits the exception only where a defendant owns or exercises

direct control over a direct purchaser through, for example, interlocking directorates, minority stock ownership, loan agreements, or trust arrangements. *In re Brand Name Prescription Drugs Antitrust Litig., supra,* 123 F.3d at 605–06.

■ Here, Pomerantz contends that Microsoft controlled the pricing of Windows 98 and exercised unfettered discretion in setting the price. However, whatever reasons the OEMs and retailers may have for apparently cooperating with Microsoft's pricing scheme, Pomerantz did not allege that Microsoft owns or directly controls the OEMs and retailers, that Microsoft controls or determines the price that OEMs or retailers charge consumers for Windows 98, or that he and the putative class members own or directly control the OEMs or retailers.

Thus, we conclude that the trial court did not err when it declined to find that the control exception applied here.

#### 2. Cost Plus Contract Exception

■ As Microsoft points out, Pomerantz raises the cost-plus contract exception for the first time on appeal. We therefore will not address this issue. *See Estate of Stevenson v. Hollywood Bar & Cafe, Inc.,* 832 P.2d 718 (Colo.1992)(arguments never presented to, considered, or ruled upon by a trial court may not be raised for the first time on appeal).

In light of the above, we conclude that Pomerantz lacks standing to maintain this action.

### V. Void Contract Provision

Pomerantz contends that, notwithstanding the above, he has standing to seek relief on his claim that the licensing agreement between him and Microsoft is void pursuant to § 6–4–121 and that the trial court erred by not expressly addressing this claim. We conclude that Pomerantz does not have standing under this provision.

Section 6–4–121 provides:

All contracts or agreements made by any person while a member of any combination, conspiracy, trust, or pool prohibited

under this article which are founded upon, or are the result of, or grow out of, or are connected with any *violation of this article, either directly or indirectly, shall be void,* and no recovery thereon or benefit therefrom shall be had by or for any such person. Any payments made upon, under, or pursuant to such contract or agreement to or for the benefit of such person may be recovered in an action by the party making the payment or his heirs, personal representatives, or assigns.

(Emphasis added.)

Pomerantz argues that, apart from *Illinois Brick,* he has standing to maintain a claim under this provision as an indirect purchaser, independently of the rest of the Act, because the provision applies to those who violate the act "directly or indirectly." In support of his argument, Pomerantz notes that the General Assembly left these terms in the statute when it amended the Act in 1992, even after the decisions in *Illinois Brick* and *Stifflear.* We disagree.

■ Simply stated, under this provision, any contract made *in violation of the Act* is void. Regardless of the modifying adverbial phrase "directly or indirectly," this provision presupposes a violation of the Act. Because we have determined that Pomerantz lacks standing to maintain an action under the Act, we conclude that he cannot meet the threshold requirement of demonstrating a violation of this provision.

Our conclusion is further supported by the rules of statutory construction.

■ When construing a statute, we ascertain and give effect to the General Assembly's intent based upon the plain meaning of the statute's language. *Farmers Reservoir & Irrigation Co. v. Consol. Mut. Water Co.,* 33 P.3d 799 (Colo.2001). Further, statutes should be construed as a whole to give consistent, harmonious, and sensible effect to all their parts. *In re Marriage of Davisson,* 797 P.2d 809 (Colo.App.1990).

The void contract provision, § 6–4–121, is part of a broad statutory scheme concerning the restraint of competitive forces. The Act contains substantive provisions and a comprehensive remedial scheme. Statutory remedies include enforcement by the attorney general under § 6–4–111, C.R.S.2001; injunctive relief under § 6–4–113, C.R.S.2001; civil damages under § 6–4–114; and refunds for void contracts under § 6–4–121. These remedial provisions are necessarily based upon a violation of the Act, which, as stated above, Pomerantz cannot demonstrate. Moreover, absent the General Assembly's express direction otherwise, we conclude that an anomalous result would be reached if we were to apply *Illinois Brick* to some provisions of the Act and not to others.

In light of the above, we need not address the other statutory interpretation issues raised by Pomerantz and Microsoft.

Thus, we do not find standing for Pomerantz's claim under the void contract provision of the Act.

The judgment is affirmed.

Judge MARQUEZ and Judge VOGT concur.