COLORADO COURT OF APPEALS                    **2017COA17**

Court of Appeals No. 14CA2167
Arapahoe County District Court Nos. 12JD798, 13JD76, 14JD476 & 14JD508
Honorable Elizabeth Beebe Volz, Judge

The People of the State of Colorado,

Petitioner,

In the Interest of D.Z.B.,

Juvenile-Appellee,

and Concerning Arapahoe County Department of Human Services,

Appellant.

APPEAL DISMISSED

Division VI
Opinion by CHIEF JUDGE LOEB
Furman and Terry, JJ., concur

Announced February 23, 2017

Douglas K. Wilson, Colorado State Public Defender, Ryann S. Hardman,
Deputy State Public Defender, Denver, Colorado, for Juvenile-Appellee

Ronald Carl, County Attorney, Michael Valentine, Deputy County Attorney,
Danielle Newman, Assistant County Attorney, Aurora, Colorado, for Appellant

¶ 1     The Arapahoe County Department of Human Services (the Department) appeals the juvenile court's order placing D.Z.B., a juvenile offender, in a Department-managed residential child care facility in lieu of bond while the juvenile's adjudication was pending. The Department does not appeal D.Z.B.'s final adjudication as delinquent or his ultimate sentence to the same residential facility. Instead, the Department asserts that the court did not have the authority to place D.Z.B. in the facility preadjudication and in lieu of bond over the Department's objection. Because we conclude that the Department lacks standing, we dismiss the Department's appeal and express no opinion on the merits of the Department's appeal.

## I.     Background

¶ 2     The Department requested that the juvenile court certify the court file for D.Z.B.'s juvenile proceedings for appeal, but did not request any relevant transcripts. Thus, the facts below are taken from the records in the court file.

¶ 3     D.Z.B. had a complex history with the Department and the juvenile court beginning in 2012. Prior to the history recited below, the juvenile court placed D.Z.B. in the care of the Department in

1

lieu of bond on multiple occasions. He repeatedly violated the court-imposed conditions of his bond, and the juvenile court placed him in increasingly supervised services (i.e. from in-home care, to nonresidential treatment, to foster care, etc.).

¶ 4 As relevant here, in early 2014, D.Z.B. pleaded guilty in two delinquency cases. The juvenile court adjudicated him delinquent and sentenced him to probation that included a placement at Jefferson Hills, a residential child care and treatment facility managed by the Department. Apparently, this was the first time D.Z.B. had been placed in a residential treatment facility. D.Z.B. entered Jefferson Hills in February 2014, and he was diagnosed with significant mental health and developmental issues during that stay.

¶ 5 D.Z.B. subsequently began treatment and therapy and did well at Jefferson Hills. He was successfully discharged from the facility into the care of his father and, despite the recommendation from Jefferson Hills, D.Z.B. received no in-home services following his release.

¶ 6 Within two months of his release from Jefferson Hills, D.Z.B. was charged with three additional delinquent acts. D.Z.B. was still

on probation at this time and, consequently, the prosecution sought to revoke or modify probation in his two prior cases. D.Z.B. was appointed a public defender and a Guardian Ad Litem (GAL) for his pending delinquency and probation revocation matters. The public defender requested that the Department investigate treatment and confinement options for D.Z.B. at a pretrial conference on August, 12, 2014.

¶ 7     At a hearing on September 5, 2014, the GAL and defense counsel argued for residential treatment both prior to adjudication and as a sentence if D.Z.B. was adjudicated delinquent.[1]

¶ 8     At the same hearing, in response to defense counsel's earlier request for treatment options, the Department stated through counsel that D.Z.B. had been accepted to four residential child care facilities. However, at that time, the Department objected to D.Z.B. being placed in one of the child care facilities in lieu of bond and recommended that he be placed in the Division of Youth Corrections if he were ultimately adjudicated delinquent. The Department further argued that the juvenile court did not have the

---

[1] Due to the lack of transcripts, we do not know what, if anything, the prosecution may have stated regarding its position on bond and, later, sentencing.

authority to order the Department to place D.Z.B. in a residential child care facility prior to his adjudication when the Department objected to such a placement.

¶ 9 The juvenile court ordered briefing on the issue of the court's authority to place D.Z.B. in a residential child care facility preadjudication over the Department's objection. The GAL, defense counsel, and the Department filed briefs with the juvenile court one week later on September 12. The prosecution apparently took no stance as it did not file a brief.

¶ 10 On September 17, the juvenile court held a hearing regarding preadjudication placement. The minute order in the record reflects that the juvenile court allowed those present (the district attorney, defense counsel, the GAL, and counsel for the Department) to make a record regarding their respective views on placement. As previously noted, the transcripts from the court's hearings are not part of the record on appeal. However, we assume that the Department, D.Z.B., and the GAL made arguments consistent with their briefs. At the conclusion of the hearing, the juvenile court issued a minute order that "placement would be in lieu of bond to

4

[the Department] at an appropriate residential child care facility as soon as placement is available."

¶ 11     On September 19, the juvenile court signed a temporary custody order, referencing its placement and bond order from September 17, and placed D.Z.B. in the custody of the Department effective on September 22, 2014, when placement at Jefferson Hills was predicted to become available.[2]

¶ 12     At some point, the Department requested a written order from the juvenile court regarding the court's ruling that it had the authority to order placement with the Department in lieu of bond. The court issued a detailed written order on September 22, 2014, concluding that it had the statutory authority to place D.Z.B. in lieu of bond despite the Department's objection; finding that it was in the best interests of D.Z.B. and the community to order such a placement; and placing D.Z.B. in Jefferson Hills in lieu of bond.

¶ 13     On October 16, the juvenile court adjudicated D.Z.B. delinquent and sentenced him to probation on the condition that he continue treatment at Jefferson Hills.

---

[2] The record is not clear as to who had legal and physical custody of D.Z.B. from September 17 through September 22.

¶ 14 The Department now appeals the juvenile court's September 22 written order concluding that the court had the authority to place D.Z.B. in Jefferson Hills prior to adjudication and in lieu of bond over the Department's objection.[3]

## II. Discussion

¶ 15 Because of the procedural posture of this case, the public defender's office is defending the juvenile court's September 22 order even though the outcome of this appeal will have no practical effect on D.Z.B.

¶ 16 In its answer brief, the public defender proffers five threshold issues that it asserts necessitate the dismissal of this appeal: mootness; untimeliness of the Department's appeal; an insufficient record for appeal; the lack of a final appealable order; and the Department's lack of standing to prosecute the appeal.

¶ 17 Because we agree that the Department lacks standing, we do not address the remaining threshold issues. We also express no opinion on the merits of the Department's appeal, and do not address those issues as well.

---

[3] The Department concedes that the juvenile court has the authority to place a juvenile in a residential child care facility in lieu of bond when the Department does not object to the placement.

## A.  Standard of Review

¶ 18    A court does not have jurisdiction over a case unless the plaintiff has standing to bring it.  *E.g.*, *First Comp Ins. v. Indus. Claim Appeals Office*, 252 P.3d 1221, 1222 (Colo. App. 2011). Therefore, we must first determine whether the Department has standing before we can address the merits of its appeal.  *See id.*  If the Department does not have standing, we must dismiss the appeal.  *Id.*

¶ 19    Standing is a threshold jurisdictional issue that can be raised at any time.  *Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004); *Wibby v. Boulder Cty. Bd. of Cty. Comm'rs*, 2016 COA 104, ¶ 9.

¶ 20    Standing is a question of law that this court reviews de novo. *E.g., Hawg Tools, LLC v. Newsco Int'l Energy Servs., Inc.*, 2016 COA 176, ¶ 47.

## B.  Law

¶ 21    To establish standing, an appellant must demonstrate that (1) it suffered injury in fact and (2) the injury was to a legally protected interest.  *First Comp Ins.*, 252 P.3d at 1223.

¶ 22    An injury that is overly indirect or incidental to the action is not sufficient.  *Id.*  Instead, the injury prong of the standing

analysis requires a "concrete adverseness which sharpens the presentation of issues that parties argue to the courts." *Id.* (quoting *Ainscough*, 90 P.3d at 856).

¶ 23 "Whether the plaintiff's alleged injury was to a legally protected interest 'is a question of whether the plaintiff has a claim for relief under the constitution, the common law, a statute, or a rule or regulation.'" *Barber v. Ritter*, 196 P.3d 238, 246 (Colo. 2008) (quoting *Ainscough*, 90 P.3d at 856).

¶ 24 When, as here, an appellant brings a claim under a statute, the standing inquiry turns on whether the statutory provision "can properly be understood as granting persons in the [appellant]'s position a right to judicial relief." *Vickery v. Evelyn V. Trumble Living Trust*, 277 P.3d 864, 868 (Colo. App. 2011) (quoting *Pomerantz v. Microsoft Corp.*, 50 P.3d 929, 932 (Colo. App. 2002)).

¶ 25 There are three factors to consider when determining whether a statute confers standing to a particular plaintiff: "(1) whether the statute specifically creates such a right in the plaintiff; (2) whether there is any indication of legislative intent to create or deny such a right; and (3) whether it is consistent with the statutory scheme to imply such a right." *First Comp Ins.*, 252 P.3d at 1223 (quoting

*Olson v. City of Golden*, 53 P.3d 747, 752 (Colo. App. 2002)); *see also Taxpayers for Pub. Educ. v. Douglas Cty. Sch. Dist.*, 2015 CO 50, ¶ 15.

¶ 26    Under certain circumstances, a nonparty to a civil action can have standing to prosecute an appeal. *See, e.g.*, *People in Interest of C.A.G.*, 903 P.2d 1229, 1233 (Colo. App. 1995). Generally speaking, a nonparty must still have suffered an injury in fact, and the injury must be related to a legally protected interest. *See, e.g.*, *First Comp Ins.*, 252 P.3d at 1222. Further, "[i]f, following *entry of final judgment*, it appears that the non-party was *substantially aggrieved by the disposition* of the case in the trial court, a non-party has standing to appeal." *C.A.G.*, 903 P.3d at 1233 (emphasis added); *see also Miller v. Clark*, 144 Colo. 431, 432, 356 P.2d 965, 966 (1960).

¶ 27    The word "aggrieved" refers to a substantial grievance such as the denial to the party of some claim of right, either property or person, or the imposition upon him or her of some burden or obligation. *AMCO Ins. Co. v. Sills*, 166 P.3d 274, 275-76 (Colo. App. 2007). Thus, not every nonparty that is simply adversely affected by a judgment is substantially aggrieved, and, thus, every nonparty

9

who has a grievance does not necessarily have standing to appeal. *Id.*

## C. Analysis

¶ 28 In its opening brief, the Department anticipated that standing would be an issue on appeal and stated that although it was not a party to the delinquency proceedings, it had standing to prosecute the appeal because "the order granting legal custody of D.Z.B. to the Department and requiring the Department to place D.Z.B. in lieu of bond, thereby incurring the costs of placement, creates sufficient cognizable interest to allow the Department to seek review of the [juvenile court] order." The Department thus appears to argue that the cost of preadjudication placement is the injury in fact or substantial grievance that gives it standing. In support of its argument, the Department heavily relies on *C.A.G.*, 903 P.2d 1229, for the proposition that a custody order in favor of a county department of human services confers standing on the Department.

¶ 29 We disagree with the Department's contentions and conclude that, on the record and under the circumstances here, the Department does not have standing to prosecute this appeal. In

10

reaching this conclusion, we distinguish the facts here from those described in *C.A.G.*

### 1. The Department Was a Nonparty

¶ 30 Although not dispositive, we start with the Department's concession that it is not a party to the delinquency actions against D.Z.B. It appears from the minute order on September 5, 2014, that the Department only appeared at the hearing because defense counsel requested that it consider preadjudication placement options for D.Z.B. It had no other role or interest in the outcome of the delinquency actions against D.Z.B.

¶ 31 Even after filing a brief in support of its position that the juvenile court did not have authority to place D.Z.B. over the Department's objection prior to adjudication, the Department was not a party to the delinquency action and continued to have no interest in the outcome of the case.

¶ 32 To have standing, the Department must, therefore, show that any injury it sustained as a result of the juvenile court's actions was not a mere adverse effect, but a substantial grievance. *See AMCO Ins. Co.*, 166 P.3d at 275.

## 2. Injury in Fact

¶ 33    The Department's alleged injury, the cost of placing D.Z.B. in Jefferson Hills for less than one month, is, in our view, incidental to D.Z.B.'s adjudication.  *See First Comp Ins.*, 252 P.3d at 1223 (for a party to have standing, its injury in fact cannot be indirect or incidental to the action).

¶ 34    The Children's Code requires the state department of human services (DHS) to oversee the administration of juvenile programs and the delivery of services for juveniles.  § 19-2-202, C.R.S. 2016.  In the juvenile justice context, the Children's Code also requires DHS to establish and operate facilities necessary for the care, treatment, and rehabilitation of juveniles legally committed to its custody.  § 19-2-403, C.R.S. 2016.  The Department is equally tasked with these responsibilities because county departments of human services are agents of DHS and are charged with the administration of programs in their respective counties in accordance with DHS's rules and regulations.  § 26-1-118(1), C.R.S. 2016 ("The county departments . . . shall serve as agents of [DHS] and shall be charged with the administration of public assistance and welfare and related activities in the respective counties in

accordance with the rules and regulations of [DHS].").  In other words, as a county department of human services, the Department is a "functional division[] of [DHS] for the convenient administration of the state program and [is] not [an] independent entit[y] separate and distinct from the state."  *Wigger v. McKee*, 809 P.2d 999, 1004 (Colo. App. 1990) (quoting *Nadeau v. Merit Sys. Council*, 36 Colo. App. 362, 365, 545 P.2d 1061, 1063 (1975)).

¶ 35    Therefore, the cost of placing D.Z.B. at Jefferson Hills while his adjudication was pending directly arises from the Department's statutory functions under the Colorado Children's Code, sections 19-1-101 to 19-7-103, C.R.S. 2016, and the Colorado Human Services Code, sections 26-1-101 to 26-23-105, C.R.S. 2016.  The obligation and cost of caring for D.Z.B. at Jefferson Hills is incidental to his delinquency action because the Department has a statutory duty to care for and house children removed from their homes in delinquency actions.  *See AMCO Ins. Co.*, 166 P.3d at 275-76 (when a judgment exposes a nonparty to obligations not created by the judgment, the nonparty does not have standing); *cf. People v. Padilla-Lopez*, 2012 CO 49, ¶ 20 (El Paso County Department of Human Services is not a victim, for purposes of restitution, in a

13

child abuse case; the county department was not "aggrieved" by "having to provide foster care and counseling" to the child victim because "those costs are suffered by [the county department] because of [the county department]'s statutory duty to provide 'necessary shelter, sustenance, and guidance' to dependent and neglected children." (quoting § 26-1-201(1)(f), C.R.S. 2011)).

¶ 36    Moreover, the Department has not shown an injury here. The record does not provide any information as to the costs associated with D.Z.B.'s preadjudication placement in Jefferson Hills. For example, we do not know how Jefferson Hills is funded (i.e. payment per client, payment for a certain number of beds regardless of occupation, payment in a monthly rate assuming 100% occupancy, etc.); we do not know how much it cost, if anything, to house D.Z.B. in Jefferson Hills for less than one month (September 22 to October 16) before he was adjudicated and sentenced. And, significantly, we do not know if the Department, DHS, or some combination was responsible for paying for D.Z.B.'s preadjudication placement. Thus, the Department's allegation that it was "significantly aggrieved" by the costs incurred by placement is a conclusory statement and devoid of support in the record. And,

14

even if the costs were proven, costs of temporary placement are hardly the type of injury that "sharpens the presentation of issues," *First Comp Ins.*, 252 P.3d at 1223 (quoting *Ainscough,* 90 P.3d at 856), in an adjudication action because such costs had no bearing on the outcome of the final adjudication or the sentence and treatment that D.Z.B. received as part of his adjudication.

### 3. Injury to a Legally Protected Interest

¶ 37    Even if the Department had shown an injury in fact that was a substantial grievance directly related to this delinquency action, we conclude the injury was not to a legally protected interest.

¶ 38    The Department argued below and argues on appeal that the juvenile court did not have authority under the Children's Code to order a preadjudication placement with the Department in lieu of bond over the Department's objection.  Thus, it is making a statutorily based argument allegedly supported by the Children's Code.  When a plaintiff makes a claim based on a statute, that statute must confer standing upon the plaintiff to do so.  *See Taxpayers for Pub. Educ.,* ¶15; *Barber,* 196 P.3d at 246; *First Comp Ins.,* 252 P.3d at 1223.  We, therefore, must consider whether the Children's Code can properly be understood to grant the

15

Department, a county human services agency, a right to judicial relief in a delinquency action. *Taxpayers for Pub. Educ.*, ¶ 15; *Vickery*, 277 P.3d at 868. In making that determination, we consider whether the Children's Code specifically confers standing to the Department, whether the Children's Code gives any indication of legislative intent to create or deny standing to the Department, and whether it would be consistent with the statutory scheme to infer the Department's standing. *See First Comp Ins.*, 252 P.3d at 1223.

¶ 39    First, the Children's Code does not expressly confer standing to the Department or DHS to intervene in a juvenile court's determination for preadjudication placement. As the Department points out, the Children's Code rarely references county human services departments. Moreover, any such references are in the context of custodians of juveniles *after* adjudication and sentencing. *See, e.g.*, § 19-2-906.5, C.R.S. 2016.

¶ 40    Second, the legislative intent of the Children's Code is, among other things,

> [t]o secure for each child subject to these provisions such care and guidance . . . as will best serve his welfare and the interests of

society; . . . [t]o remove a child from the custody of his parents only when his welfare and safety or the protection of the public would otherwise be endangered . . .; and [t]o secure for any child removed from the custody of his parents the necessary care, guidance, and discipline to assist him in becoming a responsible and productive member of society.

§ 19-1-102(1)(a), (c), (d), C.R.S. 2016.  Moreover, the General Assembly has stated that "the juvenile justice system shall take into consideration the *best interests of the juvenile, the victim, and the community* in providing *appropriate treatment* to reduce the rate of recidivism in the juvenile justice system and to *assist the juvenile* in becoming a productive member of society."  § 19-2-102(1), C.R.S. 2016 (emphasis added).  These goals emphasize the best interests and care of the juveniles; they do not indicate any intention to create or deny standing for human service agencies such as the Department and are, to the contrary, silent as to the Department's role in implementing the Children's Code.

¶ 41    Also, the Children's Code provisions regarding preadjudication placement, for example, sections 19-2-508 and -509, C.R.S. 2016, do not directly implicate the Department.  Section 19-2-508(1) provides for the care of the juveniles in shelters, detention facilities,

or temporary holding facilities who have been removed from their homes as a result of a delinquency action. The statute specifically provides that a juvenile court can hold a juvenile without bond and place him or her in a preadjudication service program established pursuant to statute. § 19-2-508(3)(a)(IV)(E), C.R.S. 2016.[4] It is silent as to the role of a human services agency despite the fact that said agencies are charged with managing detention and holding facilities. Similarly, under section 19-2-509(2), the juvenile court has the authority to place a juvenile in a preadjudication service program in lieu of bond without mention of the role, if any, of human services agencies such as the Department. Specifically, the statute is silent as to whether the Department may essentially veto a preadjudication placement by an objection.

¶ 42    Each of these statutes provides for the protection, care, and treatment of the juvenile; they do not indicate any legislative intent

---

[4] Because we are concerned with whether the statute confers standing on the Department, we do not consider the merits of the Department's argument that the juvenile court lacked authority because Jefferson Hills was not a "preadjudication service program" contemplated in this statute. Such an argument has no bearing on whether the intent of the statute was to confer standing on the Department.

to create or deny standing to the Department under the circumstances here.

¶ 43 Third, as previously mentioned, the Children's Code does not provide protections for the Department. Rather, it provides for the protection, care, and treatment of juveniles subject to its provisions and, as relevant here, children removed from their homes for delinquent acts. We have found no statute, and the Department does not cite any, that indicates that conferring standing on the Department to interfere with a juvenile court's decision regarding preadjudication placements is consistent with the framework of the Children's Code. The General Assembly's own legislative declarations make it clear that the Children's Code was established for the protection and rehabilitation of children, not the protection of a human services agency's interests.

¶ 44 Thus, we conclude that the Children's Code does not confer standing on the Department to challenge a juvenile court's ruling regarding preadjudication placement. As a result, the Department does not have standing to prosecute this appeal.

#### 4. *C.A.G.* is Distinguishable

¶ 45 As noted earlier, the Department relies on *C.A.G.* for its argument that it has standing despite being a nonparty to the delinquency action. But the Department's reliance on that case is misplaced.

¶ 46 In *C.A.G.*, a division of this court concluded that a county department of human services (the county department) had a legally cognizable interest sufficient to prosecute an appeal of an adjudication order finding the juvenile delinquent and ordering the county department to provide certain services to C.A.G. and to provide him with an "appropriate education." *C.A.G.*, 903 P.2d at 1231, 1233. The division emphasized that the county department had legal custody of the juvenile and that the juvenile court ordered the county department to provide the juvenile an "appropriate education" while not in the physical custody of the county department. *Id.*

¶ 47 The Department argues that the temporary custody order placing D.Z.B. in its legal custody, specifically at Jefferson Hills, is analogous to the custody order and order for educational services in

*C.A.G.* and, therefore, it has standing to prosecute the present appeal.

¶ 48 We conclude that *C.A.G.* is distinguishable. To the extent that *C.A.G.* includes language broad enough to confer standing on the Department and other county human services agencies generally in every case in which they were granted temporary custody, we respectfully disagree. *E.g., People in Interest of S.N-V.*, 300 P.3d 911, 914 (Colo. App. 2011) (one division of the court of appeals is not bound by a decision of another division).

¶ 49 The division in *C.A.G.* explicitly restricted its conclusion that the county department had a "legal cognizable interest sufficient" to prosecute the appeal to the circumstances of that case. *C.A.G.*, 903 P.2d at 1231 ("We conclude that, under the circumstances present here, . . . ."). The division's ultimate holding on standing thus reflects a limitation that a legal custody order does not always confer standing: "the burden imposed by [a legal custody] order *may* obviously 'substantially aggrieve' the person upon whom it is placed." *Id.* at 1233 (emphasis added). This limited holding is consistent with the law in Colorado that a nonparty who is adversely affected by a judgment is not necessarily substantially

21

aggrieved and, thus, does not necessarily have standing. *AMCO Ins. Co.*, 166 P.3d at 275.

¶ 50 In our view, the determinative circumstances in *C.A.G.* were that the county department was appealing from a final adjudication order that placed legal custody with the county department and ordered the county department to provide an appropriate education for the juvenile while he was not in the county department's physical custody. Moreover, the adjudication order required the county department to file with the court a plan describing how it proposed to meet the unique obligations that the juvenile court had imposed.

¶ 51 The circumstances with D.Z.B. were notably different from those in *C.A.G.* Unlike in *C.A.G.* where the county department was contesting the final adjudication order, here the Department is appealing from a *temporary* order placing D.Z.B. in its custody while he *awaited* final adjudication. The fact that the county department in *C.A.G.* was appealing the final adjudication order is significant because the cases cited by the division in *C.A.G.* hold that nonparties can have standing to appeal *final judgments* when the *disposition* substantially aggrieved the nonparty. *C.A.G.*, 903

P.2d at 1233 (citing *Maul v. Shaw*, 843 P.2d 139 (Colo. App. 1992); *Robert-Henry v. Richter*, 802 P.2d 1159 (Colo. App. 1990)).  Here, the Department is not contesting the final judgment or disposition, only the temporary order for preadjudication placement.  The Department does not argue that it was substantially aggrieved by the final disposition of the case, only that it was substantially aggrieved by the cost of D.Z.B.'s temporary placement at Jefferson Hills during the pendency of the adjudication proceeding.

¶ 52     Moreover, as explained above, we think it significant that the Department was not ordered to do anything that it was not already required to do by statute — house D.Z.B., a juvenile removed from his home in a delinquency matter, in one of its facilities.  In contrast, the division in *C.A.G.* was concerned with an adjudication order that required the county department to undertake a task that it was ill-equipped to do — educate the juvenile when it did not have physical custody of him.  *Id.* at 1230-31.  The juvenile court in *C.A.G.* recognized the uniqueness of the situation because it ordered the county department to present a written plan as to how it would accomplish the tasks the court ordered.  *Id.* at 1231.  In this case, by contrast, there was no such onerous or unique burden

23

imposed on the Department, and the Department was not required to present a plan to the juvenile court for successful completion of its obligations under the preadjudication order. There was no question of successful completion because all the Department had to do to fulfill the order was transport D.Z.B. to Jefferson Hills and house him there until his final adjudication.

¶ 53 Hence, the only way that the Department could have been aggrieved was, as it alleged, by paying for D.Z.B.'s short stay at Jefferson Hills prior to his adjudication — a grievance that fell within its statutory duty to provide services to juveniles and, in our view, did not cause the Department to be "substantially aggrieved." §§ 19-1-102, 19-2-102, 26-1-118(1); *AMCO Ins. Co.*, 166 P.3d at 275; *C.A.G.*, 903 P.2d at 1233.

¶ 54 We also note that *C.A.G.* is distinguishable from this case because of the difference in the basis of the agencies' arguments. In *C.A.G.*, the county department was objecting to the adjudication order on the grounds that the county department was not properly equipped to provide an "appropriate education" while C.A.G. was in his parents' home rather than in the physical custody of the county department. *C.A.G.*, 903 P.2d at 1231. The division in *C.A.G.*

emphasized that legal custody was with the county department only because the county department, as C.A.G.'s legal guardian, was required to act as a de facto parent, and its objection to the court's order requiring appropriate education was based on that *parens patriae* status. *Id.* at 1233. While the county department in *C.A.G.* also mentioned the lack of funding for such an undertaking and argued that the juvenile court did not have the authority to order educational services while the juvenile was not in its physical custody, the agency's underlying concern was how it could successfully carry out such an order for the benefit of C.A.G.

¶ 55 Here, by contrast, the Department did not base its argument on the best interests of D.Z.B. or whether it could have been successful in housing D.Z.B. prior to adjudication. Indeed, this appeal will not affect D.Z.B.'s adjudication, treatment, or probation at all. The Department's argument, instead, was based solely on the alleged expense of D.Z.B.'s preadjudication confinement, an expense routinely incurred by the Department as a result of its required statutory functions as an agency of DHS. Thus, although the Department may have been "adversely affected" by the court's September 22 order, it was not substantially aggrieved because the

25

obligation of housing D.Z.B. when he was removed from his home preadjudication arose from the Department's statutory duties under the Children's Code. *AMCO Ins. Co.*, 166 P.3d at 275.

### III. Conclusion

¶ 56    Because the Department lacks standing, we dismiss its appeal.

JUDGE FURMAN and JUDGE TERRY concur.